**COLUMBIA RIO GRANDE REGIONAL HEALTHCARE, L.P., d/b/a Rio Grande Regional Hospital, Appellant,**

v.

**Alice H. HAWLEY and James A. Hawley, Appellees.**

**No. 13–03–427–CV.**

Court of Appeals of Texas, Corpus Christi–Edinburg.

March 23, 2006.

---

Brad M. LaMorgese, R. Brent Cooper, Diana L. Faust, Cooper & Scully, Dallas, for appellant.

Clem V. Lyons, LoAn K. Vo, Laura R. Pazin, Lyons & Rhodes, San Antonio, Darrin Walker, Law Office of Darrin Walker, for appellees.

Before Justices RODRIGUEZ, CASTILLO, and GARZA.

## OPINION

Opinion by Justice GARZA.

Columbia Rio Grande Healthcare, L.P., d/b/a Rio Grande Regional Hospital, appeals from a judgment entered against it on a jury verdict. Ten issues are raised in this appeal. These fall into four general categories: (1) challenges to the sufficiency of the evidence, (2) issues related to the admissibility of certain expert testimony, (3) jury charge issues, and (4) issues relat-

ed to damages and to the pre- and post-judgment interest rates.[1] To ensure that all issues necessary for final disposition of the appeal are decided, we address the issues in a different order than how they are presented by appellant. *See* Tex. R.App. P. 47.1. Specifically, we begin with errors that would require the rendition of judgment in appellant's favor and then discuss errors that would require a new trial. Errors that would require modification of the judgment will be discussed last. We overrule all issues and affirm the judgment of the trial court.

## Background

On November 22, 2000, Alice H. Hawley presented to Armando Arechiga, M.D., her primary care physician, complaining of cramps, nausea, and vomiting. Dr. Arechiga referred Mrs. Hawley for a Doppler exam. Upon learning the results of the exam, Dr. Arechiga sent Mrs. Hawley directly to Rio Grande Regional Hospital (the "Hospital") for treatment of a perforated diverticuli. On November 23, 2000, Jesus Rodriguez, M.D., performed a resection of Mrs. Hawley's colon because of the ruptured diverticuli. During the surgery, Dr. Rodriguez examined Mrs. Hawley's liver and detected no abnormalities. Mrs. Hawley was discharged from the Hospital on November 29, 2000.

The excised portion of Mrs. Hawley's colon was sent to Jose Valencia, M.D., a pathologist whose office is located within the Hospital. Dr. Valencia's examination of the tissue specimen revealed that Mrs. Hawley had cancer. Dr. Valencia diagnosed Mrs. Hawley as having adenocarcinoma of the colon with four of five lymph nodes being positive. Dr. Valencia staged the cancer, in terms of severity, as Stage 3 or what is known as "Duke's C" cancer.

Mrs. Hawley did not learn that she had cancer until October 2001, almost a full year after she was diagnosed by Dr. Va-

---

1. As presented in appellant's brief, the ten issues on appeal are the following:

(1) the trial court's erroneous admission of the testimony of Dr. Susan Escudier and Dr. Billie Marek constituted harmful error probably resulting in the rendition of an improper judgment;

(2) the trial court's erroneous exclusion of the testimony of new and independent cause evidence constituted harmful error probably resulting in the rendition of an improper judgment;

(3) appellant is entitled to a new trial based on the trial court's failure to instruct the jury on "new and independent" cause;

(4) appellant is entitled to a new trial based on charge error due to the trial court's failure to instruct the jury that Mrs. Hawley must have had a greater than 50% chance of survival on November 28, 2000 for appellant's negligence to be a proximate cause of her injuries;

(5) appellant is entitled to a new trial based on the trial court's failure to instruct the jury not to consider the conduct of Dr. Valencia, an independent contractor physi-

cian, when considering whether the negligence of appellant proximately caused Mrs. Hawley's injuries;

(6) appellant is entitled to the rendition of judgment in its favor based on the legal insufficiency of the evidence to support the jury's finding to Question One;

(7) appellant is entitled to a new trial based on appellees' failure to segregate the damages allegedly caused by appellant from those damages caused by Mrs. Hawley's pre-existing condition;

(8) appellant is entitled to rendition of judgment or, in the alternative, a new trial because there is insufficient evidence to establish the reasonableness and necessity of the medical expenses awarded by the jury and modified by the trial court;

(9) the judgment must be modified because the damages and associated prejudgment interest should have been limited pursuant to the provisions of section 11.02 of former Article 4590i of the Texas Revised Civil Statutes; and

(10) the judgment must be modified to decrease pre- and post-judgment interest rates from ten to five percent.

lencia. By that time, she had an inoperable tumor in her liver that was roughly the size of a softball. Mrs. Hawley was treated with chemotherapy by Susan Escudier, M.D. and Billie Marek, M.D. Although her initial response to the chemotherapy was excellent, the cancer was too far advanced to be cured. The treating physicians continued treatment in the hope of prolonging Mrs. Hawley's life for as long as possible.

On February 26, 2002, Mrs. Hawley and her husband, James A. Hawley, sued the Hospital. Their live petition alleged that the Hospital was negligent in failing to timely and properly convey the cancer diagnosis to Mrs. Hawley, her surgeon, Dr. Rodriguez, and her admitting physician, Dr. Arechiga. The Hawleys also complained that the Hospital had failed to follow its own polices and procedures in the reporting of surgical pathology results.

The case was tried to a jury, which returned a unanimous verdict that the Hospital's negligence was a proximate cause of the injuries and damages sustained by the Hawleys. The trial court entered a judgment on the verdict, and the Hospital subsequently appealed the judgment to this Court.

At the time of trial in February 2003, Mrs. Hawley's life expectancy was approximately six months. While the instant appeal was pending before this Court, Mrs. Hawley succumbed to complications caused by her cancer. Her husband continues in this matter as sole appellee.

## I. Challenges to the Sufficiency of the Evidence

In its sixth and eighth issues, the Hospital contends that the evidence is insufficient to support the jury's findings. The

standards of review for legal and factual sufficiency challenges are settled and will not be restated here.[2]

## A. The Jury's Answer to Question One

■ In its sixth issue, the Hospital contends that the evidence is legally insufficient to support the jury's affirmative answer to Question One, which asked, "Was the negligence, if any, of ... the Hospital a proximate cause of injuries to Alice H. Hawley?" The Hospital argues that there was no competent evidence that Mrs. Hawley had more than a 50 percent chance of survival in November 2000 and that the evidence is therefore legally insufficient to prove that the Hospital's negligence was a proximate cause of Mrs. Hawley's injuries.

■ The Texas Supreme Court has explained that, in cases such as this, the ultimate standard of proof on the issue of causation is whether, by a preponderance of the evidence, a negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred. *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex.1995); *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 400 (Tex.1993); *Duff v. Yelin*, 751 S.W.2d 175, 176 (Tex.1988). Put simply, it must be "more likely than not" that the ultimate harm or condition resulted from the defendant's negligence. *Kramer*, 858 S.W.2d at 400. Thus, recovery is barred if the defendant's negligence deprived the patient of only a 50 percent or less chance of survival. *Milo*, 909 S.W.2d at 511; *Kramer*, 858 S.W.2d at 400.

Much of the trial focused on Mrs. Hawley's chances of survival in November 2000, when Dr. Valencia initially diagnosed her with cancer. Both sides produced ex-

---

**2.** *See City of Keller v. Wilson*, 168 S.W.3d 802, 827–28 (Tex.2005) (legal sufficiency); *Golden*

*Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761–62 (Tex.2003) (factual sufficiency).

pert medical testimony to explain how colon cancer is staged and what the various rates of survival are for the different stages.[3] The uncontradicted testimony established that, if Mrs. Hawley had been fully evaluated following her initial diagnosis, her cancer would have been staged at either "Duke's C" or "Duke's D."

Patients afflicted with cancer staged at Duke's C and Duke's D have markedly different rates of survival. Dr. Escudier testified that the survival rate for Duke's C patients who are properly treated is between 40 and 60 percent. She believes that the rate is actually closer to 60 percent, but she acknowledges the existence of older studies that place the rate below 50 percent. Dr. Escudier attributes the discrepancy between the old and new studies, in part, to improvements in imaging technology. With better imaging, patients are staged more accurately, meaning fewer patients with Duke's D are incorrectly staged at Duke's C. Thus, in Dr. Escudier's opinion, the actual survival rate has not necessarily improved for Duke's C patients. The survival rate has improved statistically, in part, because fewer patients with more advanced cancer are mistakenly staged at Duke's C, which has led to an overall increase in the survival rate for Duke's C patients.

Dr. Escudier's estimate of the survival rate was supported by the opinions of the other oncologists who testified at trial. For instance, Dr. Marek estimated the survival rate for Duke's C to be approximately 65 percent. Even Eric Raefsky, M.D., an oncologist from Nashville, Tennessee, who was called as an expert witness by the Hospital, agreed with Dr. Es-

cudier: "[I]f you look at groups of patients as a whole prospectively, an average Duke's C colon cancer patient treated with adjuvant chemotherapy, a five-year survival or overall survival of 60 percent seems reasonable to me."

There was also very little disagreement about the survival rate of patients suffering from Duke's D cancer. Their prognoses range from zero to 30 percent.

The main dispute at trial was whether Mrs. Hawley had Duke's C or Duke's D cancer in November 2000. The Hawleys maintained that the cancer was Duke's C, but the Hospital attempted to prove that Mrs. Hawley had already developed the more advanced and less treatable Duke's D. In attempting to prove their respective cases, both sides were frustrated by a common problem: Mrs. Hawley did not undergo a full evaluation at the time of her initial diagnosis. Instead, nearly 11 months elapsed before any imaging was performed. The uncontradicted expert testimony produced at trial established that radiographic imaging is a critical factor in accurately staging cancer. Without confirming the existence of a new tumor, a patient cannot be properly staged at Duke's D. That is, a Duke's D diagnosis requires confirmation that the cancer has spread to a new location and formed a new growth area or tumor, which can be identified visually and can be measured. In other words, the tumor must be clinically demonstrable. Thus, in Mrs. Hawley's case, the cancer could be properly staged at Duke's D only if there was evidence of a tumor in her liver. At trial, the Hospital did not offer any direct evidence to establish that a tumor was present in Mrs.

---

**3.** In this appeal, the Hospital contends that, for various reasons, certain testimony given by Mrs. Hawley's treating physicians was inadmissible. The Hospital contends that the trial court committed reversible error by allowing the jury to hear the challenged testimony. In Section II of this opinion, we provide a discussion of these complaints and why we find them to have no merit.

Hawley's liver on or before November 2000.

Instead, the Hospital presented expert opinion testimony that, given the large size of Mrs. Hawley's tumor 11 months after her initial diagnosis, the tumor must have been present in her liver when she was initially diagnosed back in November 2000. The Hawleys countered with expert testimony explaining that the presence of some cancerous cells in a secondary location does not necessarily warrant a Duke's D diagnosis. In fact, all the oncologists who testified at trial recognized a distinction between "micrometastatic" disease and "macrometastatic" disease. Micrometastatic disease signifies the migration of cancerous cells from a primary growth area to other locations within the body, where the cells may or may not ultimately form a new cancerous growth, depending on the ability of the body's immune system to defeat them. Metastatic or macrometastatic disease means that a new cancerous growth has been formed by the metastatic cells and that the new growth is discernable and can be measured. Essentially, it means that a new, identifiable and demonstrable tumor has formed.

All the oncologists who testified at trial agreed that, at the time of her initial diagnosis, Mrs. Hawley suffered from at least micrometastatic disease. That is, they agreed that the cancer had spread, at least microscopically, from Mrs. Hawley's colon to her liver. This condition is consistent with a Duke's C diagnosis.

Dr. Raefsky, the Hospital's expert, took his opinion one step further. He testified that a tumor was present in Mrs. Hawley's liver in November 2000 and that the tumor would have been visible by proper imaging, meaning that Mrs. Hawley's cancer had already progressed to Duke's D. Upon further examination, Dr. Raefsky gave the following testimony:

**Counsel for Hawleys:** Okay. So the reason that you're equivocating, and I understand, is because no one did follow up on Alice when she was diagnosed.

No one followed up at that time, right? She wasn't staged?

**Dr. Raefsky:** That is correct.

**Counsel for Hawleys:** And you said we really don't know if she had overt evidence of metastatic disease in November of 2000 because nothing was done? That's what you said?

**Dr. Raefsky:** That is correct. Let me just say we do know that she had at least micrometastatic disease in November of 2000.

**Counsel for Hawleys:** Right. And my experts agree with you on that, that she had to have had micrometastatic disease because she eventually came down with metastasis that was identified as originating in the bowel, correct, in the colon?

**Dr. Raefsky:** Correct.

**Counsel for Hawleys:** So we know there was micrometastatic disease. What you're saying is, we really don't know if she had overt evidence of metastatic disease in November of 2000?

**Dr. Raefsky:** Correct.

Drs. Marek and Escudier, the oncologists who treated Mrs. Hawley, gave similar testimony. During cross-examination by the Hospital's attorney, Dr. Marek testified that he had "no doubt" that Mrs. Hawley had micrometastatic spread of her adenocarcinoma of the colon in November 2000. Dr. Marek further testified that, in November 2000, the growth would not have been measurable by any current radiographic means. By definition, this limitation places Mrs. Hawley's cancer in the Duke's C category.

Dr. Escudier also testified on the subject. She testified that the cancer must have spread by November 2000 because it was, in fact, later discovered in Mrs. Hawley's liver. What cannot be known, according to Dr. Escudier, is whether the spread was microscopic disease, meaning Duke's C, or macroscopic disease, meaning Duke's D. Counsel for the Hospital asked Dr. Escudier whether a "spiral CT scan" would have shown a tumor in Mrs. Hawley's liver in November 2000. Dr. Escudier replied, "It's possible. I mean, you can't say one way or another ... I don't know what her blood tests were. I don't know if the surgeon looked at her liver or not." Dr. Escudier also gave the following testimony in which she maintained that a diagnosis beyond Duke's C could not be made based on the information available:

Counsel for Hospital: In retrospect, now that we can look back a little bit over two years ago, we know she wasn't Duke's C at that time; is that your understanding?

Dr. Escudier: We don't know that because we don't have any liver imaging or liver exploration.

Counsel for Hospital: Is it reasonable to assume that the liver cancer or the liver metastases was already present in November of 2000 when the adenocarcinoma was removed from the colon?

Dr. Escudier: We don't have any data to say [that] because she had no scans done at that time.

* * *

Counsel for Hospital: Okay. You do agree with me that if somebody's diagnosed with Duke's D, they have a much more grim prognosis for five-year survival than somebody with Duke's C? Is that correct?

Dr. Escudier: Yes.

Counsel for Hospital: And by definition, Duke's D is where we know there is metastasis to another organ?

Dr. Escudier: Yes.

Counsel for Hospital: Do you agree with me that in retrospect, now knowing that Ms. [sic] Hawley ends up with a tumor of this size in her liver, she was, in fact, a Duke's D in November of 2000, when the primary [growth] was removed?

Dr. Escudier: But again, the Duke's D is based on either radiologic evidence or biopsy evidence for metastatic disease, so—

* * *

Dr. Escudier: Which wasn't done at that time.

Counsel for Hospital: But in retrospect?

Dr. Escudier: I mean, there was—like I said, there certainly was some cancer there. How much cancer was there is pure speculation.

Counsel for Hospital: But it was there?

Dr. Escudier: Again, every—in 50 percent of Duke's C [patients], the cancer has already spread at the time it's diagnosed.

Testimony from Dr. Rodriguez, the surgeon who operated on Mrs. Hawley in November 2000, was also offered at trial. Dr. Rodriguez testified that he saw no signs of cancer during the surgery. He examined Mrs. Hawley's abdomen for other pathology but discovered no indication of any abnormalities. Dr. Rodriguez specifically examined Mrs. Hawley's liver from within her body both visually and by palpating her liver with his hands. Dr. Rodriguez testified that such procedures are useful in detecting "gross pathology," including tumors, but also testified that

these practices were not 100 percent effective.

Based on a complete review of the record, we conclude that there is legally-sufficient evidence to prove that Mrs. Hawley had a greater than 50 percent chance of survival at the time of the Hospital's negligence. In reaching this conclusion, we recognize that this case involved a hotly-contested fact issue as to whether Mrs. Hawley's cancer was Duke's C or Duke's D in November 2000. The Hawleys produced substantial evidence to prove that Mrs. Hawley's cancer could not be staged beyond the Duke's C category and that Mrs. Hawley's chances of survival were therefore well above 50 percent. This evidence included, among other things, testimony from the two oncologists who treated Mrs. Hawley, testimony from the surgeon who examined Mrs. Hawley's liver and took the tissue sample that led to the initial diagnosis of colon cancer, and testimony from the pathologist who made the initial diagnosis.

Notably, in presenting its sufficiency challenge to this Court, the Hospital has neglected Dr. Rodriguez's testimony regarding his examination of Mrs. Hawley's liver in November 2000. Dr. Rodriguez testified that his examination uncovered no signs of gross pathology, that is, no signs of a tumor and thus no signs of macrometastatic disease. This testimony, together with the other expert testimony produced at trial, strongly indicates that Mrs. Hawley's cancer had not advanced beyond Duke's C and that her chances of survival at the time of the Hospital's negligence were approximately 60 percent.

In conducting our review of the record, we have not excluded from consideration the Hospital's evidence on the issue. The Hospital produced testimony from pathologists and from its own oncologist to prove that, given average tumor growth rates and the size of the tumor when it was finally treated, the tumor must have been present in Mrs. Hawley's liver and clinically demonstrable in November 2000. Thus, according to the Hospital's witnesses and evidence, Mrs. Hawley's cancer had already advanced to Duke's D and her chances of survival were below 50 percent.

We find it noteworthy that none of the testimony given by the Hospital's witnesses tended to prove that either the experts or their testimony were in any respect incompetent or unreliable. To the contrary, the Hospital's witnesses recognized the qualifications and competency of the Hawleys' experts. The point of dissension among the experts was whether it was reasonable to use statistics on the doubling times of tumors to estimate how large the tumor in Mrs. Hawley's liver was in November 2000. The Hospital's experts suggested that such an approach was appropriate, but the jury also heard testimony that the approach was unreliable and unreasonable. In some instances, the mixed testimony came from the Hospital's own witnesses. For example, Dr. Raefsky testified as follows:

**Counsel for Hawleys:** And you say you know the growth rate of most colon cancers.

What—are we going to get into that, about how fast this cancer was growing inside Alice?

**Dr. Raefsky:** Again, you know, I hope not. Because, obviously, there is conjecture. And as I said here, you know, I was talking about my experience with how colon cancers grow in most people.

The fact that we don't know a certainty in November of 2000 compared to October of 2001, you're right. That certainly is conjecture on my part as to what I think is most likely based on

my experience of treating hundreds of colon cancer patients.

**Counsel for Hawleys:** Dr. Escudier seemed to think that it's very difficult to predetermine generally the growth rate of a colon cancer. Do you agree with that?

**Dr. Raefsky:** Yes, I do.

**Counsel for Hawleys:** And in this case, whether it was microscopic spread or just a nonpalpable lesion in her ... liver in November of 2000, we know it grew dramatically over the next eight to ten months, don't we? It was a dramatic increase in size?

**Dr. Raefsky:** Again, we don't know what the size of the lesion was and we don't know how thoroughly Dr. Rodriguez palpated the liver in the sense of he wasn't doing a cancer surgery. In other words, it certainly is quite feasible that he did less than a thorough job because he felt he had no reason to suspect cancer.

**Counsel for Hawleys:** He won't like to hear that, you know?

He thought he examined it pretty well according to his deposition.

But anyway, if there was a microscopic spread or if there was a lesion there, say, one or two centimeters that he missed, we still have to concede that that was a very aggressive tumor to have gotten the size it did within 10 or 11 months, correct?

**Dr. Raefsky:** Uh-huh.

**Counsel for Hawleys:** You have to say yes or no.

**Dr. Raefsky:** Yes.

Although Dr. Raefsky initially relied on his professional experience to support his opinion testimony that a cancerous growth in Mrs. Hawley's liver would have been clinically demonstrable in November 2000, he subsequently conceded that, to some extent, his testimony was based on conjecture, rather than hard science, because of the difficulty in determining the actual growth rate of untreated cancer.

The reasonableness of applying experiences such as Dr. Raefsky's, experiences with patients who are treated, to estimate the growth rate of a tumor in an untreated patient, such as Mrs. Hawley, became a heated fact issue for the jury. It was again raised by the Hospital on cross-examination of William Anderson, M.D., a pathologist called as an expert witness by the Hawleys. Dr. Anderson's testimony cast doubt on the value of Dr. Raefsky's testimony, as well as the Hospital's other evidence based on the doubling times of tumors in patients who, unlike Mrs. Hawley, actually received treatment upon diagnosis.

**Dr. Anderson:** Well, the doubling time is basically the growth rate, how long it takes that tumor to double. The problem with that is that as the tumor changes, this doubling time is going to change as well and it may go pretty much off the chart because it's going so fast.

The other real problem with any statistics in the doubling time in the literature is that all of those people are treated patients. Nobody finds a patient with a tumor and says, well, we're not going to treat you for ten months so we can get you into the doubling stage. It doesn't happen. In the medical care system, it doesn't happen. So the group of the people you have in the statistics are treated patients. So then we have to go to the—outliers, as I mentioned before, the ones that aren't treated. That's the difference in this tumor. And that's what we have in this situation.

On further cross-examination, Dr. Anderson explained how, in his opinion,

the Hospital's retrospective staging of Mrs. Hawley's cancerous liver growth was erroneous and improper under the traditional methodology of cancer staging:

> **Counsel for Hospital:** We agree that Ms. [sic] Hawley had at least micro metastases to the liver, correct?
>
> **Dr. Anderson:** In all likelihood.
>
> **Counsel for Hospital:** Micro metastases to the liver would be a Duke's D; is that correct?
>
> **Dr. Anderson:** No.
>
> **Counsel for Hospital:** Metastases to the liver would be a Duke's D?
>
> **Dr. Anderson:** No. The stages were set up by what you actually found. That's how they set it up. So you can't speculate because the staging was set in all these statistics, okay, you know there's a tumor, it's palpable at least in the liver. If it's less than that, then—as we said, people have these cells circulating all the time. But if it's less than that, it's a C. That's just the way it was clinically set up. So you can't go back and say, well, because we think it might be, we'll call it a D. You can't do that. If you can prove it's there, it's a D. If you don't, it's a C. That's how all the statistics are done. So it's erroneous to say, well, we think the micro metastases is a D because the clinical criteria is being able to demonstrate the metastases somewhere else and if you can't do that, you can't say it is a D.

As the cross-examination continued, Dr. Anderson testified that Dr. Rodriguez's physical examination of Mrs. Hawley's liver would have probably revealed a tumor if she had macrometastatic disease of the liver in November 2000:

> **Counsel for Hospital:** So Dr. Valencia was correct when he diagnosed—first said this was a Duke's C based on what he saw when the colon was removed; is that correct?
>
> * * *
>
> But that's all he saw was what was right there in the colon; is that correct?
>
> **Dr. Anderson:** Yes.
>
> **Counsel for Hospital:** There were no CT scans done, no radiologic x-rays done. So nobody knows—
>
> **Dr. Anderson:** Well, that's not exactly true. There was a physical examination of the liver by the surgeon in an area in the hilum, which is a fairly thin thing, and would be able to—fairly readily palpate a descent [sic] size lesion there.
>
> **Counsel for Hospital:** Descent [sic] size. What size is that?
>
> **Dr. Anderson:** Centimeter or so.
>
> * * *
>
> **Counsel for Hospital:** We agree that it's not a hundred percent [accurate] when a surgeon palpates the liver to see if he feels a tumor of some sort?
>
> **Dr. Anderson:** Well, nothing's a hundred percent in medicine.
>
> **Counsel for Hospital:** Because it could be deep down in the liver?
>
> **Dr. Anderson:** That's the point. It depends on where the tumor is in the hilum. In the thin part of the liver, it comes down into a wedge and where this tumor is probably about is that thick (indicating). And, yeah, if there's a mass, a firm mass there a centimeter across, you're probably going to feel something there.

Thus, both the Hospital and the Hawleys supported their version of events with evidence, including expert testimony. Of course, it is the jury's role, as the finder of fact, to resolve conflicts in the evidence. *City of Keller v. Wilson,* 168 S.W.3d 802, 820 (Tex.2005). In a legal sufficiency re-

view, we must assume that jurors resolved all conflicts in accordance with the verdict. *Id.* We have reviewed the entire record in this case, and although we recognize the existence of a hotly-contested issue of fact, we will not disturb the jury's resolution of the conflicts and contradictions presented by the evidence. The evidence detailed above adequately assures us that a reasonable and fair-minded juror could find that Mrs. Hawley's chances of survival were greater than 50 percent at the time of the Hospital's negligence. Accordingly, the Hospital's sixth issue is overruled.

## B. Reasonable and Necessary Medical Expenses

■ In its eighth issue, the Hospital contends that the evidence is legally and factually insufficient to establish the reasonable and necessary medical expenses awarded by the jury and modified by the trial court.

Mrs. Hawley's medical bills were admitted into evidence, as were affidavits by Dr. Marek and Eliseo Pina, the custodian of records for the South Texas Cancer Center, the hospital where Mrs. Hawley was treated. Mrs. Hawley's medical bills totaled $209,443. The affidavits by Dr. Marek and Mr. Pina asserted that the expenses reflected in the medical bills were reasonable and necessary to treat Mrs. Hawley. At trial, Dr. Marek testified that only one-third of the medical expenses would have "probably" been incurred if the Hospital had not been negligent.

The jury found that the Hospital's negligence caused Mrs. Hawley to incur reasonable and necessary medical expenses in the amount of $400,000. The trial court reduced the award to $139,628.67, an amount which equals two-thirds of Mrs. Hawley's total expenses and is consistent with Dr. Marek's testimony.

In two sub-issues, the Hospital contends that the evidence is insufficient to support the final award because Dr. Marek used the word "probably" in his testimony and because Dr. Marek based his estimate on the false assumption that Mrs. Hawley had not developed macrometastatic disease at the time of the Hospital's negligence. We overrule each sub-issue.

### 1. Certainty of Testimony

■ It is unclear what type of sufficiency challenge the Hospital seeks to raise by its first sub-issue. The Hospital appears to generally assert that the word "probably" renders expert opinion testimony incompetent or otherwise inadmissible and therefore insufficient to establish the award for reasonable and necessary medical expenses. We disagree.

The supreme court has aptly addressed the distinction between the various burdens of proof used at trial and what the supreme court describes as "proof of an absolute certainty":

[I]n searching for truth, the law does not, and should not, require proof of an absolute certainty of causation or any other factual issue. It always settles for some lower threshold of certainty, whether beyond a reasonable doubt in criminal law, clear and convincing evidence in certain civil matters involving constitutional rights, or the more typical civil burden of reasonable probability.

*Kramer,* 858 S.W.2d at 405.

■ In medical malpractice cases, plaintiffs are required to show evidence of a "reasonable medical probability" or "reasonable probability" that their injuries were proximately caused by the negligence of one or more defendants. *Milo,* 909 S.W.2d at 511. It is thus unremarkable and, in fact, fully expected that Dr. Marek's testimony would fall short of "absolute certainty." *See Kramer,* 858 S.W.2d

at 405. Only testimony of "reasonable probability" is required in cases such as this. *See Milo,* 909 S.W.2d at 511. Given this "lower threshold of certainty," we believe that Dr. Marek's use of the word "probably" to qualify his opinion did not *ipso facto* render his testimony incompetent or inadmissible, as the Hospital contends. *See Kramer,* 858 S.W.2d at 405. The Hospital's first sub-issue is overruled.

## 2. Micrometastatic Disease Versus Macrometastatic Disease

The second sub-issue raised by the Hospital is premised on what appears to be an inaccurate interpretation of the record. The Hospital contends that Dr. Marek's estimate of reasonable and necessary medical expenses was unreliable because it was based on an assumption that Dr. Marek's own testimony later proved to be unfounded and false. We disagree.

A review of the testimony reveals a critical discrepancy between the Hospital's representation of Dr. Marek's testimony and what is actually documented in the record. Dr. Marek testified that Mrs. Hawley would have probably incurred only one-third of her medical expenses if she had begun treatment at the time of diagnosis, assuming she did not develop macrometastatic disease requiring additional treatment.

The parties disagree about whether Dr. Marek later testified that Mrs. Hawley had already developed macrometastatic disease at the time of diagnosis. According to the Hospital, Dr. Marek testified that, at the time of diagnosis, Mrs. Hawley "had [already] metastasized with certainty." Thus, in the Hospital's view, Dr. Marek's testimony established that Mrs. Hawley would have required additional treatment and therefore would have incurred reasonable and necessary medical expenses in excess of the one-third estimate previously posited by Dr. Marek.

We disagree. Dr. Marek actually testified as follows: "[W]e just unfortunately can't draw a whole lot [of conclusions] except to say, with certainty, that she did have micrometastatic disease at the time of her diagnosis." The Hospital's interpretation of the record assumes that the "micrometastatic disease" mentioned in the preceding quote refers to and is interchangeable with the "metastatic disease" that Dr. Marek assumed Mrs. Hawley did not have at the time of her diagnosis.

As discussed above, the uncontradicted evidence adduced at trial established a significant distinction between micrometastatic disease and metastatic or macrometastatic disease. All the experts who testified at trial agreed that, at the very least, Mrs. Hawley suffered from micrometastatic disease at the time of her diagnosis. Dr. Marek testified to as much in the above quote. We do not interpret Dr. Marek's testimony to mean that Mrs. Hawley's condition was actually the more advanced condition of metastatic or macrometastatic disease, as the Hospital suggests. Dr. Marek's testimony is expressly qualified by the assumption that a new, clinically demonstrable tumor had not developed in Mrs. Hawley's liver at the time of her diagnosis and that she therefore did not suffer from metastatic or macrometastatic disease.

In evaluating a legal-sufficiency challenge, every reasonable inference deducible from the evidence must be indulged in favor of the prevailing party. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827–28 (Tex.2005); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998). Under this standard, we conclude that there is enough evidence in the record for reasonable and fair-minded people to reach different con-

clusions as to the amount of reasonable and necessary medical expenses incurred by Mrs. Hawley as a result of the Hospital's negligence. *See Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex. 1995). The Hospital's legal-sufficiency challenge is therefore overruled. *See Wal–Mart Stores, Inc. v. Canchola,* 121 S.W.3d 735, 739 (Tex.2003).

■ In evaluating a factual-sufficiency challenge, this Court must review the entire record in a neutral light and determine whether the contested finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761–62 (Tex.2003) (factual sufficiency). Applying this standard, we hold that the evidence is factually sufficient to support the award of reasonable and necessary medical expenses.

The Hospital's eighth issue is overruled.

## II. Challenges to Evidentiary Rulings

The Hospital's first and second issues challenge the trial court's admission and exclusion of certain expert testimony. The trial court has broad discretion in this area. *Exxon Pipeline Co. v. Zwahr,* 88 S.W.3d 623, 629 (Tex.2002). For an expert's opinion testimony to be admissible, the expert must be qualified, the expert's opinion must be relevant to the issues in the case, and the expert's opinion must be based upon a reliable foundation. *Id.* at 628–29 (citing TEX.R. EVID. 702; *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 720 (Tex.1998); *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995)). It is settled in Texas that a trial court's ruling on the admissibility of evidence will not amount to reversible error unless the error probably led to the rendition of an improper judg-

ment. TEX.R.APP. P. 41.1(a); *McCraw v. Maris,* 828 S.W.2d 756, 758 (Tex.1992). The supreme court has found it impossible to prescribe a specific test for this determination, and it has therefore become a judgment call entrusted to the sound discretion and good sense of the reviewing court from an evaluation of the whole case. *Nix v. H.R. Mgmt. Co.,* 733 S.W.2d 573, 576 (Tex.App.-San Antonio 1987, writ ref'd n.r.e.) (citing *Lorusso v. Members Mutual Ins. Co.,* 603 S.W.2d 818, 821 (Tex.1980)); *see also Ponder v. Texarkana Mem'l Hosp., Inc.,* 840 S.W.2d 476, 479 (Tex.App.-Houston [14th Dist.] 1991, writ denied).

### A. Admission of Testimony by Treating Physicians

In its first issue, the Hospital argues that the trial court erred by admitting the testimony of Drs. Escudier and Marek.

#### 1. Testimony by Dr. Escudier

A video deposition of Dr. Escudier was played to the jury at trial. Dr. Escudier was one of Mrs. Hawley's treating physicians. On appeal, the Hospital contends that Dr. Escudier's testimony was inadmissible for numerous reasons.

■ As a preliminary matter, the Hospital argues that, even though Dr. Escudier was one of Mrs. Hawley's treating oncologists, she was not qualified as an expert in the field of colon cancer treatment because she had no special training beyond medical oncology. *See* TEX.R. EVID. 702. We find this criticism unfounded given the following exchange:

**Counsel for Hospital:** I see, Doctor, that you're a medical doctor, and you're board certified in both oncology and hematology; is that correct?

**Dr. Escudier:** Correct.

**Counsel for Hospital:** Have you been practicing as an oncologist your entire history as an MD?

**Dr. Escudier:** Yes.

**Counsel for Hospital:** Do you subspecialize in any kind of oncology?

**Dr. Escudier:** I do everything.

**Counsel for Hospital:** Do you have any special interest in one type of cancer or tumor?

**Dr. Escudier:** I do everything. What I like the best is the malignant hematology and breast cancer, but I—and I do everything.

**Counsel for Hospital:** Do you have any specific training other than generalized oncology in treating colon cancer or colon cancer with metastases?

**Dr. Escudier:** Nothing beyond the medical oncology.

**Counsel for Hospital:** Is there any specific training available, or a fellowship in—

**Dr. Escudier:** No.

**Counsel for Hospital:** Okay.

In response to counsel's questioning, Dr. Escudier explained that, beyond a fellowship in medical oncology, no specific training or fellowship is available in the field of colon cancer or colon cancer with metastases. The Hospital has failed to direct this Court to any portion of the record that contains evidence contradicting Dr. Escudier's testimony, nor has this Court discovered any evidence disproving her statements. Dr. Escudier also testified that she had completed a fellowship in medical oncology and had spent much of her career treating patients with colon cancer. We therefore find no merit in the Hospital's criticism of Dr. Escudier's qualifications to give expert testimony on the subject of colon cancer treatment, including survival rates for patients whom she routinely treats as an oncologist.

We share the confusion expressed by counsel for the Hawleys when he asked who could be more eminently qualified to give expert opinion testimony based on professional and intimate knowledge of the circumstances of this particular disease in this particular patient than a triple board-certified oncologist who has provided much of the care undertaken to cure and palliate the conditions afflicting Mrs. Hawley. These are the very conditions which now form the heated focus of contention in this case. Surely some preeminent practitioners and scholars fit the description, but by no means is this Court a medical expert in its own right. We rely on the parties and their counsel to educate us in many matters, including the complexities and nuances of negligence claims arising in the healthcare industry.

In this case, the Hospital argues that Dr. Escudier, a treating physician, was not qualified to testify, and yet, not once during her deposition did counsel for the Hospital ever challenge Dr. Escudier's qualifications. At one point, counsel asked if Dr. Escudier had any greater training or education in the treatment of colon cancer than a fellowship in medical oncology from M.D. Anderson, along with board certifications in internal medicine, hematology, and oncology, and a daily practice of treating patients with all forms of cancer, including a great number suffering from colon cancer. Dr. Escudier testified that no such training is available. The Hospital never undertook to disprove Dr. Escudier's testimony in this regard. The Hospital's expert, though qualified in his own right as a board-certified oncologist, was not so vastly accomplished in knowledge, training, or experience that this Court can appreciate any meaningful reason why he, but not Dr. Escudier, should be deemed qualified to testify as an expert on the subject of colon cancer treatment and survival rates.

We find it curious that counsel for the Hospital lodged his objections to Dr. Escudier's testimony after his own expert oncologist, Dr. Raefsky, gave the following deposition testimony:

**Counsel for Hawley:** I know you read [Dr. Escudier's deposition] ..., but do you agree with me that she said Duke's C, average five-year survival is 60 percent, and she said that she felt that that would be applicable to her patient?

Do you know she testified to that?

**Dr. Raefsky:** I think in this particular case that Mrs. Hawley's prognosis was probably a little bit worse based on the number of positive nodes. But I think, you know, to a reasonable guess, her prognosis is one that I'm willing to accept.

**Counsel for Hawley:** Whose diagnosis, Dr. Escudier?

**Dr. Raefsky:** Correct.

In his deposition, Dr. Raefsky went on to recognize Dr. Escudier as "a well-trained, well-qualified oncologist."

The record also shows some interesting, if not ironic, inconsistencies in the qualifications the Hospital demanded of "expert oncologists." Dr. Raefsky, the Hospital's expert oncologist, gave the following testimony about his training and qualifications to testify:

**Counsel for Hawleys:** Do you have any special training to give opinions on colon cancer specifically?

**Dr. Raefsky:** I have training in the sense that colon cancer is a very common cancer and one of the most common cancers that I treat. And therefore, I feel I have a lot of expertise about the management and prognosis of patients with colon cancer. But I don't specialize in colon cancers.

These are virtually the same qualifications possessed by Dr. Escudier, which the Hospital challenges in this appeal as being inadequate.

In a related sub-issue, the Hospital contends that it was harmed by not having an opportunity to take Dr. Escudier on voir dire at trial. We disagree. Counsel for the Hospital was afforded an opportunity to examine Dr. Escudier during her deposition to discover the data and facts underlying her testimony. At that time, if not sooner, counsel was also informed that Dr. Escudier would not appear at trial and that a video recording of her deposition would be played to the jury. The Hospital was thus aware that voir dire issues needed to be addressed during deposition, when counsel was given an opportunity to examine Dr. Escudier and to challenge her qualifications and any of the experience, knowledge, methodology, statistics, or expertise upon which her testimony would be based.

Instead of doing so, counsel repeatedly attempted to solicit expert testimony from Dr. Escudier to establish that Mrs. Hawley's cancer had progressed to Duke's D by November 2000. In fact, it was not until the trial commenced that counsel for the Hospital first raised any complaint as to Dr. Escudier's qualifications as an oncologist and first expressed a desire to take her on voir dire to examine her credentials and the medical bases for her testimony. We will not hold that the trial court erred solely because, in retrospect, counsel did not examine a witness as thoroughly as he would have liked.

■ Finally, the Hospital contends that Dr. Escudier's testimony should have been excluded because it was confusing and speculative. We have reviewed the record, as well as the appellate briefs, and must note that one of the most confusing aspects of this case—aside from the highly

technical nature of much of the relevant testimony—is the manner in which the Hospital's brief represents the testimony given by Dr. Escudier. Dr. Escudier testified unequivocally that no oncologist or pathologist could retrospectively determine with absolute certainty the exact stage of Mrs. Hawley's cancer in November 2000. Dr. Escudier emphasized repeatedly that, in her professional opinion, the exact stage of the cancer could not be known because no liver imaging was performed and thus no overt evidence of macrometastatic disease was discovered at the time of the initial diagnosis. Dr. Escudier testified that the most any physician could say with reasonable certainty is that the cancer was at least Duke's C at the time of diagnosis. Upon further questioning by counsel for the Hospital, Dr. Escudier acknowledged that, without proper liver imaging and exploration, Duke's D could not be ruled out with absolute certainty, but she also emphasized that the clinical criteria for a Duke's D diagnosis requires demonstrable evidence of a new, measurable tumor. According to Dr. Escudier, such evidence was lacking in this case, and she therefore "would just revert back to the usual Duke's C prognosis."

The Hospital criticizes Dr. Escudier for supposedly basing her testimony on speculation. We disagree. A complete reading of Dr. Escudier's testimony demonstrates that Dr. Escudier merely acknowledged the limitations of medical science, and more specifically, those of retrospective cancer staging in circumstances in which metastatic cancer is untreated for an extended period. According to Dr. Escudier, in such circumstances, a reasonable diagnosis can be made only on the objective evidence available to the diagnosing physician. Based on the objective evidence in this case, Dr. Escudier concluded that Mrs. Hawley's cancer had not advanced to Duke's D in November 2000. She based

this opinion on her experience, knowledge, and expertise, as well as her individual, professional evaluation and treatment of Mrs. Hawley. We do not fault Dr. Escudier for having the professionalism to acknowledge that her opinion could be incorrect and that the true stage of the cancer is unknowable with absolute certainty because Mrs. Hawley's initial diagnosis was not acted on for nearly a year. Nor do we find her testimony any less helpful in assisting the trier of fact simply because it was qualified by the limited data available.

We are confident that, in performing its independent, gate-keeping function, the trial court considered these and many other factors in arriving at its decision to admit Dr. Escudier's testimony. Having no basis to overturn this decision, we overrule the Hospital's first issue as it relates to the admissibility of Dr. Escudier's testimony.

## 2. Testimony by Dr. Marek

 In its first issue, the Hospital also complains of the trial court's admission of deposition testimony by Dr. Marek, a second board-certified oncologist who treated Mrs. Hawley, along with Dr. Escudier. The Hospital argues that Dr. Marek should not have been allowed to testify as to Mrs. Hawley's chances of survival in November 2000 because his opinion was based on speculation, had no factual or scientific support, was unreliable, and would not assist the jury, but would confuse them and cause them to speculate as to what his opinion really meant.

We have reviewed Dr. Marek's testimony and find these criticisms unfounded. In a video deposition played for the jury at trial, Dr. Marek testified that he had "no doubt" that Mrs. Hawley had micrometastatic spread of her adenocarcinoma of the colon in November 2000. In Dr. Marek's

opinion, the spread would not have been measurable by current radiographic means. Dr. Marek could not be absolutely certain of this because no imaging or scans had actually been performed, but he maintained that, in his professional opinion, the spread would not have been detectable or measurable in November 2000.

Like Dr. Escudier, Dr. Marek explained that a diagnosis beyond Duke's C cannot be made without clinically demonstrable proof of a new tumor that is measurable. He therefore concurred with Dr. Escudier's opinion that, based on the available data, Mrs. Hawley's cancer could not be staged beyond Duke's C as of November 2000. Like Dr. Escudier and the Hospital's expert oncologist, Dr. Raefsky, Dr. Marek testified that the survival rate for a patient suffering from Duke's C cancer was roughly 60 percent. When asked by counsel for the Hospital what Mrs. Hawley's chances of survival would have been if treatment had begun immediately upon diagnosis, Dr. Marek testified that, in his opinion, she would have had a 65 percent chance of being cured. Like Dr. Escudier, Dr. Marek acknowledged that it was "possible" that the actual cure rate could be lower than 65 percent, but he defended his prognosis as consistent with the available data, the clinical criteria for staging colon cancer, and the statistical studies for patients who undergo treatment for colon cancer. Like Dr. Escudier, Dr. Marek refused to represent his professional judgment as infallible.

On appeal, the Hospital contends that Dr. Marek's opinion was based on speculation, lacked factual and scientific support, and was therefore unreliable and inadmissable. This is a surprising choice of appellate issues, given that the Hospital's counsel raised no such concerns during Dr. Marek's deposition. After discussing with Dr. Marek the relevant statistics published in the 2002 American Society of Clinical Oncology Educational Book, the update on adjuvant chemotherapy and morbidity, the seventh edition of Devita, Principles and Practice of Oncology, the Cohen studies, a treatise by Eisenberg, and the Mortel article from the Mayo Clinic, counsel for the Hospital said, "I think Dr. Raefsky, when he was being deposed in this matter, agreed with all your statistics. I mean, he, basically said the same thing." Indeed, having reviewed the record, we find that the statistics relied upon by Dr. Marek for the different stages of colon cancer and survival rates were generally agreed upon by all the experts who testified at trial, whether they were pathologists or oncologists, and regardless of which party had hired the expert. There was also virtually no disagreement as to the criteria for staging colon cancer.

Given the substantial similarity between the probative value of the testimony by Dr. Marek and that of Dr. Escudier, we believe that any error in the trial court's admission of Dr. Marek's testimony would not amount to error that probably led to the rendition of an improper judgment. *See* Tex.R.App. P. 41.1(a); *McCraw,* 828 S.W.2d at 758. In fact, Dr. Marek's testimony largely duplicated testimony from Dr. Escudier that we have already held to be admissible. No error has been demonstrated.

■ To the extent that Dr. Marek's testimony is criticized for being confusing, we agree with the sentiment expressed by the trial court in the following exchange:

**Counsel for Hospital:** Dr. Marek in his deposition also discusses different statistics and goes back on them. In particular he's unclear, he speculates, he agrees with my expert and then says, you know, maybe, maybe not. . . .

**The Court:** That's because you do such a good job cross-examining.

We have reviewed the record and find that Dr. Marek's testimony is reasonably comprehensible and helpful to resolve an issue of fact central to the case. Our review of the record also shows that the Hospital presented evidence that conflicted with Dr. Marek's testimony. Conflicts in evidence do not necessarily render evidence inadmissible. After all, it is the jury's role to resolve conflicts in the evidence, a function which assumes the evidence on critical issues will be mixed. And, of course, agreeing with expert opinion testimony is something quite different than understanding it.

We appreciate counsel's role as an advocate for the Hospital and applaud his efforts to advance the Hospital's case by rigorously cross-examining Dr. Marek. Counsel's cross-examination developed the differences between the professional opinions of Dr. Marek and Dr. Escudier and those of Dr. Raefsky. These board-certified oncologists, who have active practices treating patients with colon cancer, disagreed about whether Mrs. Hawley had Duke's C or Duke's D colon cancer in November 2000. It seems natural and understandable that a disagreement of this nature in medical opinions among such highly qualified physicians will cause at least some confusion to lay observers. Dr. Marek can hardly be blamed for creating this inconvenience.

The problem is no doubt exacerbated at trial by the adversarial nature of how testimony is presented to the trier of fact through examination and cross-examination of witnesses. For these reasons, among others, the trial court must determine whether the probative value of the testimony is outweighed by the danger that the issues will be confused or the jury will be misled, or whether the expert's testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. *See* Tex.R. Evid. 403, 702. We believe that, in this case, the trial court did not abuse its discretion in determining that Dr. Marek's testimony should be admitted. The Hospital's first issue is overruled.

### B. Exclusion of Expert Opinion Testimony of Treating Physicians' Negligence

In its second issue, the Hospital argues that the trial court committed reversible error by excluding certain testimony regarding the negligence of Drs. Arechiga and Rodriguez, Mrs. Hawley's internist and surgeon. This evidence was offered to prove that the negligence of Mrs. Hawley's physicians was a new and independent cause of her injuries.

Before trial, the Hawleys objected to the Hospital's amended answer, in which the Hospital asserted the defense of new and independent cause for the first time six days prior to trial. The Hawleys asked the trial court to strike the pleading. The Hawleys also filed a motion *in limine* regarding any evidence that Mrs. Hawley's treating physicians were negligent in rendering treatment. The motion *in limine* has not been made part of the clerk's record in this appeal, but the reporter's record shows that the trial court granted the motion, at least in part. The trial court ruled that the Hospital could put on testimony and other evidence of what Mrs. Hawley's treating physicians should have done under the circumstances, but the court specifically cautioned counsel not to tie the conduct of the treating physicians to the word "negligence."

At trial, the Hospital offered evidence to prove that Drs. Arechiga and Rodriguez were negligent. This evidence was excluded, and the Hospital was allowed to make appropriate offers of proof. On appeal,

the Hospital contends that the exclusion of this evidence amounts to reversible error because it was the only evidence of new and independent cause.

New and independent cause, also known as superseding cause, is an inferential rebuttal defense that may be submitted to the jury as an instruction but not as a special issue. *J. Wigglesworth Co. v. Peeples*, 985 S.W.2d 659, 665 (Tex.App.-Fort Worth 1999, pet. denied) (citing Tex.R. Civ. P. 277; *Perez v. Weingarten Realty Investors*, 881 S.W.2d 490, 496 (Tex.App.-San Antonio 1994, writ denied)). A new and independent cause is some act or omission of a separate and independent agency that destroys the causal connection between the defendant's original negligent act and the occurrence in question. *Id.* (citing *Young v. Massey*, 128 Tex. 638, 101 S.W.2d 809, 810 (1937)). If an intervening cause was reasonably foreseeable by the defendant in the exercise of ordinary care, it cannot be considered a new and independent cause that will break the chain of causation. *Id.* (citing *Knoll v. Neblett*, 966 S.W.2d 622, 634 (Tex.App.-Houston [14th Dist.] 1998, writ denied); *Hall v. Huff*, 957 S.W.2d 90, 98 (Tex.App.-Texarkana 1997, writ denied)). The issue of an "intervening cause" as a bar to a defendant's liability is also dependent on whether the defendant's negligence and the forces generated by that negligence have come to a rest. *Id.* (citing *Henry v. Houston Lighting & Power Co.*, 934 S.W.2d 748, 754 (Tex.App.-Houston [1st Dist.] 1996, writ denied)).

The following factors taken from the Restatement (Second) of Torts § 442 (1965) may be considered in determining whether an intervening force rises to the level of a new and independent or superseding cause: (1) the fact that the intervening force brings about harm different in kind from that which would otherwise have resulted from the actor's negligence; (2) the fact that the intervening force's operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of the force's operation; (3) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation; (4) the fact that the operation of the intervening force is due to a third person's act or to his failure to act; (5) the fact that the intervening force is due to a third person's act that is wrongful toward the other and as such subjects the third person to liability to him; and (6) the degree of culpability of the third person's wrongful act that sets the intervening force in motion. *See Phan Son Van v. Pena*, 990 S.W.2d 751, 754 (Tex.1999) (citing *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992)); *Morris v. JTM Materials, Inc.*, 78 S.W.3d 28, 54 (Tex.App.-Fort Worth 2002, no pet.).

The Hospital has not raised any appellate issue regarding the sufficiency of the evidence to prove that it breached a duty owed to Mrs. Hawley (i.e., that its conduct fell below the standard of care that would be exercised by a hospital of ordinary prudence under the same or similar circumstances). *See Denton Reg'l Med. Ctr. v. LaCroix*, 947 S.W.2d 941, 950 (Tex.App.-Fort Worth 1997, pet. denied); *Hilzendager v. Methodist Hosp.*, 596 S.W.2d 284, 286 (Tex.Civ.App.-Houston [1st Dist.] 1980, no writ). The Hospital has only challenged the sufficiency of the evidence regarding causation. As discussed above, this particular challenge is limited to the issue of whether Mrs. Hawley's chances of survival were greater than 50 percent in November 2000, when the Hospital was allegedly negligent. The sole contention advanced by

the Hospital is that Mrs. Hawley's chances were less than 50 percent and thus she and her husband are barred from recovering damages under the loss-of-chance rule. *See Milo,* 909 S.W.2d at 511; *Kramer,* 858 S.W.2d at 400. Given the Hospital's choice of appellate issues, we have no basis for reviewing or rejecting the jury's finding that the Hospital's performance fell below the applicable standard of care owed to Mrs. Hawley. *See* Tex.R.App. P. 47.1.

To establish the inferential rebuttal defense of new and independent cause, the Hospital had to produce evidence that its negligence and the forces generated by its negligence had come to a rest at the time the physicians were allegedly negligent. *Henry v. Houston Lighting & Power Co.,* 934 S.W.2d 748, 754 (Tex.App.-Houston [1st Dist.] 1996, writ denied). That is, a new and independent cause does not exist if the chain of causation flowing from the defendant's original negligence is continuous and unbroken. *Biaggi v. Patrizio Rest., Inc.,* 149 S.W.3d 300, 309 (Tex.App.-Dallas 2004, pet. filed); *Brownsville Med. Ctr. v. Gracia,* 704 S.W.2d 68, 73 (Tex.App.-Corpus Christi 1985, writ ref'd n.r.e.).

The evidence adduced by the Hospital in support of its defense of new and independent cause was limited to testimony to the effect that it was unforeseeable that the treating physicians would not follow up on the results of the pathology tests and discover the report showing that Mrs. Hawley had colon cancer. The Hospital offered proof that the physicians were negligent in this regard; however, the negligence of a third party does not necessarily create a new and independent cause. The courts of this state have long distinguished between new and independent causes, which destroy the causal chain, freeing a defendant of liability, and concurring causes, which simply work in concert with forces generated by the defendant's negligence and do not relieve a defendant of liability. *Phoenix Refining Co. v. Tips,* 125 Tex. 69, 81 S.W.2d 60, 61 (1935) ("[N]ew and independent cause ... means 'the act or omission of a separate and independent agency, which destroys the casual connection between the negligent act or omission of the defendant and the injury complained of, and thereby becomes, in itself, the immediate cause of such injury.'") (internal citations omitted); *see also Bell v. Campbell,* 434 S.W.2d 117, 122 (Tex.1968) ("When the new cause or agency concurs with the continuing and cooperating original negligence in working the injury, the original negligence remains a proximate cause of the injury, and the fact that the new concurring cause or agency may not in such case have been reasonably foreseeable should not relieve the wrongdoer of liability.").

In this case, the Hospital's offers of proof support nothing more than a finding of a concurring cause. There is no evidence that the forces created and the harm inflicted by the physicians' alleged negligence were different in any respect from the forces put into motion by the Hospital's negligence or the harm caused by the Hospital. The causal connection in this case is quite straightforward: the Hospital's negligence led to an 11-month delay in notifying Mrs. Hawley that she had cancer. This delay allowed the cancer to go untreated, and every medical doctor who testified at trial agreed that the cancer became much worse during this 11-month period. Mrs. Hawley ultimately died of complications arising from her cancer, but she lived long enough to sue the Hospital.

The evidence offered by the Hospital and excluded by the trial court tended to prove that the delay in notifying Mrs. Hawley can also be attributed to the treat-

ing physicians, who should have reviewed her charts and discovered the diagnosis. Although this certainly seems fair, the Hospital still had the burden of proving that the effects of its negligence were cut off by the doctors' alleged negligence or had otherwise ceased by the time of the doctors' negligence. The evidence offered by the Hospital did not accomplish this. Instead, the evidence showed that the Hospital was negligent in failing to implement and follow policies and practices that would prevent such delays. The evidence also tended to prove that the causal forces set in motion by the doctors and the Hospital were intertwined in a single communication failure that caused Mrs. Hawley's injuries. The causal chain in this communication failure was continuous and unbroken, though it is obvious that many forces were at play.

▮ The admissibility of evidence is a discretionary issue for the trial court. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex.1995). Thus, to prevail on this issue, the Hospital had to establish that no basis in law exists to support the trial court's exclusion of the evidence. *See id.* The Hospital has not carried this burden. The Hospital's second issue is therefore overruled.

### III. Challenges Related to the Jury Charge

▮ Three of the Hospital's issues relate to the trial court's refusal to give requested jury instructions. A trial court must submit "such instructions and definitions as shall be proper to enable the jury to render a verdict." Tex.R. Civ. P. 277. The court must submit the questions, instructions, and definitions that are raised by the written pleadings and the evidence. Tex.R. Civ. P. 278. An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence. *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex.2000). If a trial court refuses to submit a requested instruction, the question on appeal is whether the requested instruction was reasonably necessary to enable the jury to render a proper verdict. *Id.* The trial court has "considerable discretion to determine necessary and proper jury instructions." *Id.* at 911; *Louisiana–Pacific Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex.1998); *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 451 (1997). Consequently, reversal will not lie because an instruction was refused unless a clear abuse of discretion is shown. *Butler v. De La Cruz*, 812 S.W.2d 422, 426 (Tex.App.-San Antonio 1991, writ denied).

### A. New and Independent Cause

▮ In its third issue, the Hospital contends that the trial court erred in failing to instruct the jury regarding the law of new and independent cause. If the evidence in a negligence case raises the issue of new and independent cause, it is error not to include the term in the definition of proximate cause and to define it. *Wigglesworth*, 985 S.W.2d at 665 (citing *Massey*, 101 S.W.2d at 810). The question of whether the trial court erred in refusing to give the definition turns on whether the evidence in the record raised the issue of new and independent cause. *Id.* We have reviewed the record and find no basis for submitting this instruction.

The Hospital argues that the pleadings, as well as the testimony of Dr. Tucker, supported a jury instruction on new and independent cause. The Hospital summarizes the relevant testimony as follows: "Dr. Tucker testified it was unforeseeable that during treatment of Mrs. Hawley subsequent to November 2000 and prior to October 2001, neither Dr. Arechiga nor

Dr. Rodriguez would have followed up on the pathology report." The essential contention advanced by the Hospital is that an instruction on new and independent cause was required because the Hospital's alleged negligence was cut off by the unforeseeable failures of Drs. Arechiga and Rodriguez to independently discover the pathology report and commence appropriate treatment of Mrs. Hawley's cancer.

■ We disagree. Unforeseeability is necessary, but not sufficient, for a finding of new and independent cause. Intervention of an unforeseen cause of a plaintiff's injury does not necessarily mean that there is a new and independent cause of such a character as to constitute a superseding cause which will relieve the defendant of liability. *Henry,* 934 S.W.2d at 753 (citing *Bell v. Campbell,* 434 S.W.2d 117, 121 (Tex.1968); *Teer v. J. Weingarten, Inc.,* 426 S.W.2d 610, 614 (Tex.Civ. App.-Houston [14th Dist.] 1968, writ ref'd n.r.e.)). The intervening cause of the plaintiff's injury, even if unforeseeable, may be a mere concurring cause if the chain of causation flowing from the defendant's original negligence is continuous and unbroken. *Id.* (citing *Bell,* 434 S.W.2d at 121.). That is the case here.

Although Dr. Tucker testified that Drs. Arechiga and Rodriguez should have followed up on the pathology report, Dr. Tucker's testimony did not tend to establish that the Hospital's negligence had been cut off by the doctors' failures to act. Dr. Tucker never acknowledged that the Hospital had been negligent, much less that its negligence had been superseded by something else. At best, Dr. Tucker suggested that multiple factors played into the communication failure that caused the notification delay that led to Mrs. Hawley's injuries. To the extent Dr. Tucker implicated Drs. Arechiga and Rodriguez in the delay, his testimony was vague and specu-

lative on the issue of causation, suggesting only that the doctors' failures to follow up on the report were unforeseeable and arguably contributed to the notification and treatment delays. Dr. Tucker did not testify that the doctors actually caused the notification delay or that the delay was more attributable to the doctors than to the negligence of the Hospital. Dr. Tucker also did not testify that the harm caused by the conduct of Drs. Arechiga and Rodriguez was different in any way from harm caused by the Hospital's negligence. Dr. Tucker's testimony tended to prove nothing more than the unforeseeability of the doctors' failures to act. There was no evidence that the forces created by the Hospital's alleged negligence had come to rest. Nor was there any evidence that the causal connection between the Hospital's alleged negligence and Mrs. Hawley's injuries had been destroyed by an act or omission of a third party that became the immediate cause of Mrs. Hawley's injuries. Equally remarkable is the failure of the evidence to militate in any meaningful respect toward a finding of new and independent cause under the factors endorsed by the supreme court in *Phan Son Van. See Phan Son Van,* 990 S.W.2d at 754. There was therefore no basis for submitting a jury instruction on new and independent cause. Accordingly, we conclude that the trial court did not abuse its discretion. The Hospital's third issue is overruled.

## B. Loss of Chance

■ In its fourth issue, the Hospital contends that the trial court erred in refusing to give the jury an instruction that Mrs. Hawley must have had a greater than 50 percent chance of survival on November 28, 2000 for the Hospital's negligence to be a proximate cause of her injuries. We agree with the Hospital's understanding of

the loss-of-chance rule, but for the reasons stated below, we conclude that the trial court did not commit an abuse of discretion that would warrant reversal.

The supreme court has spoken with great clarity on the loss-of-chance rule, leaving no room for disagreement: recovery in a medical malpractice case cannot be had if, at the time of the alleged negligence, the patient had a pre-existing condition from which the chance of survival was 50 percent or less. *See Milo*, 909 S.W.2d at 511; *Kramer*, 858 S.W.2d at 400. There being some evidence that Mrs. Hawley's chances of survival were less than 50 percent before the Hospital's alleged negligence, we must decide whether the trial court abused its discretion in refusing to give the jury a loss-of-chance instruction. *See Mandlbauer*, 34 S.W.3d at 912; *Butler*, 812 S.W.2d at 426.

The requested instruction accurately states the law and finds support in the pleadings and evidence. Nevertheless, the trial court could have correctly refused the instruction if it would not have assisted the jury. *See Mandlbauer*, 34 S.W.3d at 912. The supreme court has often recognized the trial court's "considerable discretion to determine necessary and proper jury instructions." *Id.* at 911; *Knighten*, 976 S.W.2d at 676; *Nicolau*, 951 S.W.2d at 451. Indeed, the trial court has much more discretion in submitting instructions and definitions than in submitting questions. *Harris v. Harris*, 765 S.W.2d 798, 801 (Tex.App.-Houston [14th Dist.] 1989, writ denied) (op. on reh'g); *see also Ishin Speed Sport v. Rutherford*, 933 S.W.2d 343, 350 (Tex.App.-Fort Worth 1996, no writ); *Grenier v. Joe Camp, Inc.*, 900 S.W.2d 848, 850 (Tex.App.-Corpus Christi 1995, no writ).

The Hospital has failed to produce any precedent from a Texas court endorsing a loss-of-chance instruction, much less any precedent holding that a trial court abuses its discretion in refusing to give such an instruction. This Court's independent research has also failed to yield any guiding precedent. The volume of the Texas Pattern Jury Charges on medical malpractice cases offers no guidance on loss-of-chance instructions, nor is any help offered in the volume on general negligence. *See* Comm. on Pattern Jury Charges, State Bar of Tex., Tex. Pattern Jury Charges: Malpractice, Premises, & Products (2003); Tex. Pattern Jury Charges: General Negligence & Intentional Personal Torts (2003). We are unaware of any documented practice of instructing Texas juries on the loss-of-chance rule. This is not to say that the practice should be disparaged or discouraged or that it does not occur. Such instructions may be commonplace and have yet escaped documentation for myriad procedural and strategic factors that so often characterize modern trial and appellate practices.

The question we must answer is not whether the loss-of-chance instruction should be rejected or endorsed. We must decide only whether the trial court abused its discretion in failing to include it in the jury charge in this case. The answer, in our opinion, rings clear from the absence of guiding precedent. We are loathe to hold that the trial court reached a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law if no assistance was available to guide the trial court to the proper result. *See In re Cerberus Capital Mgmt., L.P.*, 164 S.W.3d 379, 382 (Tex.2005). Nor can we fairly conclude that the trial court clearly failed to correctly analyze or apply the law if no appellate court in the state has set precedent requiring or even endorsing such an instruction. *See id.*

Admittedly, this Court would be remiss if it were to ignore the significance of the

excluded instruction. We recognize its value to the Hospital. We also recognize the Hospital's chief complaint, which is that, without the instruction, the jury might have returned a verdict of liability based solely on a lost chance of survival of 50 percent or less. We disagree with this assertion. As discussed above, legally-sufficient evidence was adduced at trial to prove that Mrs. Hawley's lost chance of survival was greater than 50 percent. This case is thus different than *Kramer*, where the plaintiff sought recovery for a diminished chance of survival of less than 50 percent. It is also different than *Milo*, where the uncontroverted evidence showed that the patient's chance of survival was only 40 percent before the defendant's alleged negligence. *See Milo*, 909 S.W.2d at 511; *Kramer*, 858 S.W.2d at 399.

We also believe that no abuse of discretion occurred because the loss-of-chance instruction was inherent in the jury charge. In both *Kramer* and *Milo*, the Texas Supreme Court stated that "the ultimate standard of proof on the causation issue is whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm and without

which the harm would not have occurred." *Milo*, 909 S.W.2d at 511; *Kramer*, 858 S.W.2d at 400. In each opinion, the supreme court explained that the loss-of-chance rule did not present a new hurdle for plaintiffs but was merely a necessary implication of the ultimate standard of proof. *See Milo*, 909 S.W.2d at 511; *Kramer*, 858 S.W.2d at 400. The jury charge in this case was entirely consistent with the ultimate standard of proof.[4] Because the loss-of-chance rule necessarily follows from the ultimate standard of proof, there is no basis for concluding that a loss-of-chance instruction was reasonably necessary to enable the jury to render a proper verdict. *See Mandlbauer*, 34 S.W.3d at 912. Accordingly, there was no abuse of discretion, and even if there were an abuse of discretion, we would not be able to conclude that it probably led to the rendition of an improper judgment. *See* Tex.R.App. P. 44.1(a). The Hospital's fourth issue is overruled.

### C. Conduct of Dr. Valencia

■ In its fifth issue, the Hospital contends that it is entitled to a new trial based on the trial court's failure to instruct the jury not to consider the conduct of Dr. Valencia, an independent contractor physi-

---

4. Question One asked the jury the following question: "Was the negligence, if any, of . . . the Hospital a proximate cause of injuries to Alice H. Hawley?" The following definition of "proximate cause" was given to the jury and mirrors the definition stated in the Texas Pattern Jury Charges:

> "Proximate Cause," when used with respect to the conduct of the Hospital, means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a hospital using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of any event.

*See* Comm. on Pattern Jury Charges, State Bar of Tex., Tex. Pattern Jury Charges: Malpractice, Premises, & Products 50.2 (2003). The charge also instructed the jury on the degree of certainty required for its findings:

> A "yes" answer must be based on a preponderance of the evidence unless otherwise instructed. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." The term "preponderance of the evidence" means the greater weight and degree of credible evidence admitted in this case. Whenever a question requires other than a "yes" or "no" answer, your answer must be based on a preponderance of the evidence unless otherwise instructed.

This instruction was also taken from the Texas Pattern Jury Charges. *See id.* at 40.3.

cian, when considering whether the negligence of the Hospital proximately caused Mrs. Hawley's injuries. According to the Hospital, "The error is harmful because this Court cannot determine whether the jury found liability in Question One based on the conduct of Dr. Valencia, an invalid legal theory, or the conduct of Appellant."

Question One asked whether the Hospital's negligence caused Mrs. Hawley's injuries. The jury was instructed that "[n]egligence, when used with respect to the conduct of ... the Hospital, means failure to use ordinary care, that is, failing to do that which a hospital of ordinary prudence would have done under the same or similar circumstances, or doing that which a hospital of ordinary prudence would not have done under the same or similar circumstances." The charge further instructed that the Hospital "acts or fails to act only through its employees, agents, nurses, and servants."

We cannot conclude that the exclusion of the requested instruction probably led to the rendition of an improper judgment or probably prevented the Hospital from properly presenting the case on appeal. *See* TEX.R.APP. P. 44.1(a). The charge authorized a finding of liability based only on the Hospital's negligence. The jury was instructed that the Hospital could be negligent, that the Hospital acts or fails to act, only through its employees, agents, nurses, and servants. There being no evidence that Dr. Valencia was an employee, agent, nurse, or servant of the Hospital, the charge did not authorize the jury to reach a finding of negligence based on Dr. Valencia's conduct. The Hospital's fifth issue is overruled.

## IV. Damages and Interest

### A. Segregation of Damages Caused by Pre–Existing Condition

In its seventh issue, the Hospital argues that it is entitled to a new trial based on the Hawleys' failure to segregate the damages caused by the Hospital from those damages caused by Mrs. Hawley's pre-existing condition. We disagree. The damages were sufficiently segregated between the reasonable and necessary medical expenses resulting from Mrs. Hawley's pre-existing medical condition and those caused by the Hospital. As demonstrated above, the evidence and testimony plainly distinguished between Mrs. Hawley's total medical expenses and those that were proximately caused by the Hospital's negligence. The jury was specifically instructed "not [to] include [in its award] any amount for any condition of Alice M. Hawley existing before November 28, 2000," the time of the Hospital's negligence.

The Hospital's brief is unclear as to whether its seventh issue raises a challenge to the sufficiency of the evidence or a jury-charge error. Out of an abundance of caution, we address the issue as both types of challenges.

Viewed in the light most favorable to the verdict, there was more than a scintilla of evidence to distinguish between the reasonable and necessary medical expenses resulting from Mrs. Hawley's pre-existing medical condition and those caused by the Hospital. *See Formosa*, 960 S.W.2d at 48. There is thus no basis for sustaining a legal-sufficiency challenge regarding segregation of damages.

Viewing the entire record in a neutral light, there is no basis for concluding that the contested finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. *See Golden Eagle*, 116 S.W.3d at 761–62. There is thus no basis for sustaining a factual sufficiency challenge regarding segregation of damages.

■ We also recognize that this issue appears to raise a jury-charge error predicated on the trial court's refusal to give an instruction requested by the Hospital. To the extent the Hospital seeks to raise this challenge, it has failed to adequately brief its contention, as it has provided no argument or authority to establish that the instruction actually given to the jury was erroneous or that the omission of the requested instruction probably led to the rendition of an improper judgment. *See* TEX.R.APP. P. 38.1(h); 44.1(a).

The Hospital's seventh issue is therefore overruled.

## B. Damage Cap

In its ninth issue, the Hospital contends that the judgment must be modified because the damages and associated prejudgment interest should have been limited pursuant to the provisions of section 11.02 of former Article 4590i of the Texas Revised Civil Statutes. TEX.REV.CIV. STAT. ANN. art. 4590i, § 11.02. The Hawleys contend that any application of the damage caps in this case would be a clear violation of the Open Courts Provision of the Texas Constitution. *See* TEX. CONST. art I, § 13. The Hospital concedes that the damage caps under former Article 4590i have been held unconstitutional by the Texas Supreme Court, but it argues that the caps have never been held to be unenforceable under the state legislature's broad police powers. *See Lucas v. United States*, 757 S.W.2d 687, 692 (Tex.1988) ("It is simply unfair and unreasonable to impose the burden of supporting the medical care industry solely upon those persons who are most severely injured and therefore most in need of compensation.") (citations omitted).

The Hawleys' claim against the Hospital is for common law negligence, not for wrongful death under the survival statute. In *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 901–02 (Tex.2000), the Texas Supreme Court reaffirmed that the damage caps in former Article 4590i are unconstitutional as applied to common-law claims. In this case, the trial court refused to apply the caps, even though the Hospital requested their application both before and after trial. We find no error in its refusal to do so. Accordingly, the Hospital's ninth issue is overruled.

## C. Interest Rates

■ In its tenth issue, the Hospital argues that the judgment must be modified to decrease the pre- and post-judgment interest rates from ten percent to five percent. Essentially, the Hospital argues that the trial court awarded excessive interest because the provisions of House Bills 4 and 2415 govern the interest rate applicable to the judgment in this case.[5] We disagree.

House Bills 4 and 2415 amended section 304.003(c) of the finance code, reducing the effective post-judgment interest rate from ten to five percent.[6] The bills also changed the pre-judgment interest rate, which is equal to the post-judgment interest rate applicable at the time of the judgment. TEX. FIN.CODE ANN. § 304.103 (Ver-

---

5. *See* Act of June 2, 2003, 78th Leg., R.S., H.B. 4, § 6.01 (House Bill 4); Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 1 (House Bill 2415).

6. Although House Bills 4 and 2415 are different acts, they contain almost identical revisions to the post-judgment interest provisions of the finance code. In this regard, they differ only in that House Bill 4 contains a provision prohibiting pre-judgment interest on future damages. *Compare* Act of June 2, 2003, 78th Leg., R.S., H.B. 4, § 6.02 (House Bill 4) *with* Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 1 (House Bill 2415).

non Supp.2004–05). The revisions of each bill apply to cases in which "a final judgment is signed or is subject to appeal on or after the effective date" of the act.[7] The provisions therefore apply if the judgment in this case was signed on or after the effective date of either act, or if the judgment became subject to appeal, that is, capable of being appealed, on or after the effective date of the act. *SunBridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 255 (Tex.App.-Texarkana 2005, no pet.).[8] To determine the applicability of the bills, we must first determine (1) the date each bill became effective, (2) the date the judgment was signed, and (3) the date the judgment became appealable.

House Bill 4 became effective on September 1, 2003. The judgment in this case was signed on March 27, 2003 and became appealable on that date. *See, e.g., Tesfa v. Stewart*, 135 S.W.3d 272, 279 (Tex.App.-Fort Worth 2004, pet. denied) (holding that a final judgment can be appealed after it is signed by the judge). Because the judgment was not signed on or after the effective date of House Bill 4 and because it did not become subject to appeal on or after that date, House Bill 4 does not apply in this case. *See Penny*, 160 S.W.3d at 255.

On June 1, 2003, the legislature passed House Bill 2415 by more than a two-thirds majority vote of each house. Again, the judgment in this case was signed on March 27, 2003 and therefore did not become appealable on or after the effective date of House Bill 2415. There is no basis for applying House Bill 2415. Accordingly, the Hospital's tenth issue is overruled.

## V. Conclusion

All issues raised by the Hospital are overruled and the judgment of the trial court is affirmed.

Dissenting Opinion by Justice ERRLINDA CASTILLO.

Dissenting Opinion by Justice CASTILLO.

Appellant, Columbia Rio Grande Healthcare, L.P., d/b/a Rio Grande Regional Hospital, challenges a final judgment entered subsequent to a jury verdict in favor of appellees, James A. Hawley and the estate of Alice H. Hawley. By its fourth issue, the Hospital asserts that the trial court erred in denying its request to instruct the jury on "new and independent cause." Because I would hold that the hospital has shown reversible error, I would reverse the judgment and remand. Thus, I respectfully dissent because my analysis of this dispositive issue reaches a different result. *See* Tex.R.App. P. 47.1.

### I. Background

Mrs. Hawley presented to her regular physician of many years with symptoms of diverticulitis. He referred her for screening and, because of the results, she was hospitalized the same day. Stabilized overnight, Mrs. Hawley underwent surgery the following morning. The surgeon removed a part of her digestive tract. The specimen was tested by a pathology group, which is an independent contractor of the hospital. A cancer diagnosis was included in the pathology report. The pathology report was completed and filed in Mrs. Hawley's chart the day before her release

---

**7.** *See* Act of June 2, 2003, 78th Leg., R.S., H.B. 4, § 6.04 (House Bill 4); Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 2(a) (House Bill 2415).

**8.** *See also City of Dallas v. Redbird Dev. Corp.*, 143 S.W.3d 375, 388–89 (Tex.App.-Dallas 2004, no pet.); *Columbia Med. Ctr. of Las Colinas v. Bush*, 122 S.W.3d 835, 865 (Tex. App.-Fort Worth 2003, pet. denied).

from the hospital. After two subsequent short hospital stays over a period of months, Mrs. Hawley's general health and well-being deteriorated. One hospital stay involved a routine surgical procedure stemming from her initial surgery and was performed by the same surgeon. The subsequent stay involved a diagnosis of a circulatory system condition, with a follow-up clinical visit with her regular physician. After screening showed elevated enzymes in her liver, her regular physician recommended additional diagnostics. After a delay stemming from the Hawleys' prearranged family vacation plans, additional screening showed a dramatic increase in the liver-enzyme level and a soft-ball sized mass on her liver. A biopsy showed that the mass was malignant. After seeking a second opinion from a physician who obtained and reviewed her medical records, Mrs. Hawley learned for the first time from him that, eleven months before, she was diagnosed with intestinal cancer.[1] Both Mrs. Hawley's treating physician and surgeon denied receipt of the pathology report that contained the intestinal cancer diagnosis. No reference to the report was made in discharge summaries dictated post-surgery and post-hospital stays.

Mr. and Mrs. Hawley sued the hospital for negligence. At the heart of their claim was a policy the hospital had in place for transmitting cancer-diagnosis pathology reports to treating physicians and surgeons. The distribution policy includes the distribution of the original pathology report "to the medical record." For a report "positive for cancer," the distribution policy states, in part:

A. Pathologist will verbally notify physician(s) of record

B. Pathology secretary will fax report to physician(s) of record

C. Reports will be delivered to physician(s) of record via certified mail

The jury heard that it was the custom and practice of the pathology department employees to transmit cancer reports by fax and certified mail to the physicians involved, "without exceptions." The jury also heard that pathologists would attempt verbal notification, with success dependent on immediate contact with the physician or a return telephone call. At the time in question, no logs to document the distribution were in place. Evidence showed that a return receipt confirmed delivery of the pathology report to Mrs. Hawley's treating physician. The jury heard from numerous witnesses qualified to testify as experts. From those witnesses the jury heard that the original pathology report was in Mrs. Hawley's chart prior to her release and the discharge summary did not reference the report, indicating the report was not read. Therefore, according to those witnesses, irrespective of the distribution policy, a responsibility existed, at a minimum, that the treating physician or surgeon secure the report to determine (1) what was removed from the patient during surgery, (2) the diagnosis, and (3) the post-surgical treatment.

At the close of evidence, the hospital requested, among other things, the pattern jury charge instruction on new and independent cause. The trial court denied the instruction. The jury charge contains the following instruction:

"Proximate cause," when used with respect to the conduct of RIO GRANDE REGIONAL HOSPITAL, means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a hospital

1. The physician reviewed the pathology re- port contained in her medical records.

using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of any event.

The jury answered "yes" to jury Question No. 1 which states, "Was the negligence, if any, of RIO GRANDE REGIONAL HOS-PITAL, a proximate cause of injuries to ALICE H. HAWLEY?" The jury awarded damages. The trial court entered the judgment from which the hospital appeals.

## II. Jury Charge Error

### A. Standard of Review–Jury Charge Error

The standard of review for error in the jury charge is abuse of discretion, *R & R Contractors v. Torres,* 88 S.W.3d 685, 696 (Tex.App.-Corpus Christi 2002, no pet.), which occurs only when the trial court acts without reference to any guiding principles. *In re V.L.K.,* 24 S.W.3d 338, 341 (Tex.2000). A trial court abuses its discretion by acting arbitrarily, unreasonably, or without reference to guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985); *Kajima Int'l v. Formosa Plastics Corp.,* 15 S.W.3d 289, 291 (Tex.App.-Corpus Christi 2000, pet. denied). The trial court has considerable discretion to determine necessary and proper jury instructions. *In re V.L.K.,* 24 S.W.3d at 341. When the trial court refuses to submit a requested instruction, the question on appeal is whether the requested instruction was reasonably necessary to enable the jury to render a proper verdict. *Tex. Workers' Comp. Ins. Fund v. Mandlbauer,* 34 S.W.3d 909, 912 (Tex.2000) (per curiam); *see* Tex.R. Civ. P. 277. A party is entitled to a jury question, instruction, or definition if the

pleadings and evidence raise an issue. Tex.R. Civ. P. 278; *Union Pac. R.R. Co. v. Williams,* 85 S.W.3d 162, 166 (Tex.2002). This is a substantive, non-discretionary directive to trial courts, requiring them to submit requested questions to the jury if the pleadings and any evidence support them. *Elbaor v. Smith,* 845 S.W.2d 240, 243 (Tex.1992). To determine if the failure to submit a requested instruction is error, the reviewing court must consider the pleadings, trial evidence, and the entire charge. *See Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986) (op. on reh'g); *see also* Tex.R.App. P. 44.1(a)(1). An incorrect jury instruction is only grounds for reversal if it probably caused the rendition of an improper judgment. Tex.R.App. P. 44.1(a)(1); *Louisiana–Pacific Corp. v. Knighten,* 976 S.W.2d 674, 675–76 (Tex. 1998) (per curiam).

### B. "New and Independent Cause" Instruction [2]

When defendants blame an occurrence on someone or something other than themselves, the Texas Pattern Jury Charges provide multiple alternatives. *Dillard v. Tex. Elec. Coop.,* 157 S.W.3d 429, 432 (Tex. 2005). The purpose of these instructions is to advise the jurors, in the appropriate case, that they do not have to place blame on a party to the suit if the evidence shows that the conduct of some person not a party to the litigation caused the occurrence in question. *See id.* (citing *Reinhart v. Young,* 906 S.W.2d 471, 472 (Tex.1995)). One of the alternatives involves a new-and-independent-cause instruction if the occurrence is later caused by someone else. *See id.* (citing STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 3.1 (1987)).

---

**2.** The Hawleys acknowledge that the hospital's live (unstruck) pleading provided general notice of new and independent cause.

" 'New and independent cause' means the act or omission of a separate and independent agency, not reasonably foreseeable, that destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question and thereby becomes the immediate cause of the occurrence." *Dillard,* 157 S.W.3d at 432 n. 3; *Phan Son Van v. Pena,* 990 S.W.2d 751, 754 (Tex.1999) (adopting the factors to determine whether an act is a concurring or new and independent cause);[3] *Taylor v. Carley,* 158 S.W.3d 1, 9 (Tex.App.-Houston [14th Dist.] 2004, pet. filed). Texas courts distinguish between a new and independent cause and a concurrent act. *Taylor,* 158 S.W.3d at 9 (citing *Benitz v. Gould Group,* 27 S.W.3d 109, 116 (Tex.App.-San Antonio 2000, no pet.)) A concurrent act cooperates with the original act in bringing about the injury and does not cut off the liability of the original actor. *Id.* A "new and independent cause," sometimes referred to as a superseding cause, however, is an act or omission of a separate and independent agency that destroys the causal connection between the negligent act or omission of the defendant and the injury complained of, and thereby becomes the immediate cause of such injury. *Id.* The issue of new and independent cause is a component of the ultimate issue of proximate cause and not an affirmative defense. *Id.* (citing *Rodriguez v. Moerbe,* 963 S.W.2d 808, 821 n. 12 (Tex.App.-San Antonio 1998, pet. denied)).

The instructions on new and independent cause and sole proximate cause can cover much of the same territory. *Dillard,* 157 S.W.3d at 434. However, such redundancy is contrary to the spirit of broad-form submission. *Id.* (citing *Lemos v. Montez,* 680 S.W.2d 798, 801 (Tex.1984)). The supreme court's adoption of broad-form jury submissions was intended to simplify jury charges for the benefit of the jury, the parties, and the trial court. *Romero v. KPH Consol., Inc.,* 166 S.W.3d 212, 230 (Tex.2005). It was certainly never intended to permit, and therefore encourage, more error in a jury charge. *Id.* When properly utilized, broad-form submission can simplify charge conferences and provide more comprehensible questions for the jury. *See id.* at 230. However, it is not always practicable to submit every issue in a case broadly, and broad-form submission cannot be used to broaden the harmless error rule to deny a party the correct charge to which it would otherwise be entitled. *Id.*

### C. Refusal to Instruct

I first address whether the failure to instruct is error. *See Romero,* 166 S.W.3d at 227; *Wright Way Constr. Co. v. Harlingen Mall Co.,* 799 S.W.2d 415, 422 (Tex. App.-Corpus Christi 1990, no writ). When evaluating whether a party is entitled to a jury instruction, the reviewing court must examine the record for evidence supporting submission of the instruction and ignore evidence to the contrary. *See Elbaor,* 845 S.W.2d at 243. The Hospital asserts that Mrs. Hawley's treating physician and surgeon failed to timely access the pathology report in her hospital chart, and, thus, their failure operated independently of any situation allegedly created by the hospital. The Hawleys counter that an instruction was properly denied because a

---

**3.** Testimony showed that the time differential from notice to treatment is critical in cancer cases. Thus, it follows that the timing of notice would correlate with the question of a different harm in the first factor in *Phan Son Van v. Pena,* 990 S.W.2d 751, 754 (Tex.1999). Further, a trial court may not properly refuse to submit a question merely because the evidence is factually insufficient to support an affirmative finding. *Garza v. Alviar,* 395 S.W.2d 821, 824 (Tex.1965).

superseding cause requires that an event must be unforeseeable and that the effect of the hospital's negligence must have ceased, but the evidence supports neither element. The Hawleys further state that, at most, the evidence shows a concurring cause.

Prior to her discharge from the hospital after surgery, Mrs. Hawley's chart contained the pathology report. Her treating physician compiled the discharge summary and did not reference the report in her chart which, testimony showed, reflected the report was not read. Testimony established that both the treating physician and the surgeon had access to Mrs. Hawley's chart for purposes of post-operative diagnosis and treatment. A return receipt establishes that the pathology report was mailed to and received by the treating physician's office. No independent recollection of notice to the surgeon is evident; however, testimony showed that the custom, habit, and practice was that the distribution policy for positive cancer pathology reports was followed "without exceptions." By its plain terms, the distribution policy does not require that notice be provided orally, and by fax, and by certified mail. Without question, however, all pathology reports must be filed in the patient's chart. The evidence unequivocally places the pathology report in Mrs. Hawley's chart prior to her release from the hospital post-surgery.

The crux of the Hospital's argument is that, even if the Hospital complied with the notice/distribution policy for a positive cancer pathology report, it is unforeseeable that compliance itself would result in lack of notice to the afflicted patient of the cancer diagnosis. Ample testimony established that two secretaries received twenty to thirty requests daily from physicians' and surgeons' offices requesting duplicate copies of pathology reports, after documented, full compliance with the distribution policy. Testimony showed that it was often easier to request a new copy from the pathology department than to locate the reports in a medical office. In Mrs. Hawley's case, documentation showed that the pathology report was sent to and received by the treating physician's office by certified mail, return receipt requested. The notice is consistent with one of the transmittal methods provided for in the distribution policy made the basis of the negligence claim. Notice by placement in Mrs. Hawley's chart is also consistent with the distribution policy. Even so, Mrs. Hawley was not treated for cancer until approximately eleven months after it was initially discovered by a pathologist.

The discretion afforded during the submission of instructions is not absolute. See Tex.R. Civ. P. 277. The substantive, non-discretionary directive to trial courts requires them to submit requested questions to the jury if the pleadings and any evidence support them. Elbaor, 845 S.W.2d at 243. After examining the pleadings, the entire charge, and the evidence, I would hold that the evidence of new and independent cause was fairly raised by the pleadings and the evidence and, thus, was a fact issue for the jury to decide. See Tex.R. Civ. P. 278 ("The court shall submit the questions, instructions and definitions in the form provided by Rule 277 which are raised by the written pleadings and the evidence."). A litigant is entitled to have controlling questions of fact submitted to the jury if they are supported by "some evidence."[4] Tex.R. Civ. P. 278; Wright Way Constr., 799 S.W.2d at 422 (citing

---

**4.** A controlling or ultimate issue is one that presents to the jury a complete ground of recovery or defense. Wright Way Constr. Co. v. Harlingen Mall Co., 799 S.W.2d 415, 422 (Tex.App.-Corpus Christi 1990, no writ).

*Moore v. Lillebo*, 722 S.W.2d 683, 686–87 (Tex.1986) (reversing for new trial because trial court failed to submit requested issues that were supported by some evidence)). The pleadings and, importantly, some evidence supported this issue. *See Wright Way Constr.*, 799 S.W.2d at 422. Because the Hospital was entitled to a requested jury instruction on new and independent cause, I would hold that denial of the requested instruction is without regard to guiding principles. *See Downer*, 701 S.W.2d at 241–42.

### D. Harmful Error

I next address whether the denial of the requested instruction is reversible error. Tex.R.App. P. 44.1(a); *Romero*, 166 S.W.3d at 230; *Wright Way Constr.*, 799 S.W.2d at 422. Rule 44.1(a) provides that error in the trial court properly complained of requires reversal of the judgment on appeal if it "(1) probably caused the rendition of an improper judgment; or (2) probably prevented the appellant from properly presenting the case to the court of appeals." Tex.R.App. P. 44.1(a). For an instruction to be proper, it must (1) assist the jury, (2) accurately state the law, and (3) be supported by the pleadings and evidence. Tex.R. Civ. P. 277, 278. The court's charge contains an instruction on proximate cause that includes, in part, "There may be more than one proximate cause of any event." The issue of new and independent cause is a component of the ultimate issue of proximate cause and not an affirmative defense. *Taylor*, 158 S.W.3d at 9. It is not always practicable to submit every issue in a case broadly, in broad-form submission. *Romero*, 166 S.W.3d at 230. The evidence in this case supported the inclusion of the requested instruction. The trial court's refusal to instruct on this matter effectively directed a verdict upon it. *See Wright Way Constr.*, 799 S.W.2d at 424. Based on the evidence, the jury could have found superseding cause. The jury verdict was against the proponent of the issue. Thus, the error was harmful. Accordingly, I would hold that the failure of the trial court to instruct on new and independent cause was such a denial of the rights of the Hospital as was reasonably calculated to and probably did cause the rendition of an improper verdict. *See id.* Harmful error almost certainly occurs if a defendant who has properly requested an appropriate instruction on a controlling defensive issue does not have that issue submitted to the jury. *Id.* That is precisely what occurred at trial. *Id.* Accordingly, I would sustain the Hospital's fourth issue. I would also reverse the judgment and remand for a new trial. *See* Tex.R.App. P. 43.2(d).

### E. Rendition or Remand

I am mindful that a reversal and remand of the trial court's judgment does not dispose of the issues in which appellant requests rendition of judgment. *See Wright Way Constr.*, 799 S.W.2d at 424. Ordinarily, I would next consider whether the judgment for the Hawleys can rest on the jury's finding of negligence. *See Romero*, 166 S.W.3d at 230. Although I would find reversible error entitling the Hospital to a remand, I nonetheless pause to briefly consider the seventh issue raised, because if the evidence presented was legally insufficient, then the Hospital is entitled to a rendition in its favor.[5] *See R & R Contractors*, 88 S.W.3d at 706.

---

**5.** By its ninth issue, the Hospital asserts that it is entitled to rendition on the question of medical expenses because the evidence does not show the expenses were reasonable and necessary. Under a proper measure-of-damages instruction, a fact finder has the discretion to find damages within the range of evidence presented at trial. *See Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002). The trial court modified the jury's

By its seventh issue, the Hospital asserts that the evidence is legally insufficient to support the jury's finding of negligence in Question Number 1 as a matter of law. The statement of the issue must be treated as covering every subsidiary question that is fairly included. *See* TEX.R.APP. P. 38.1(e). In a sub-issue of the same issue, the Hospital asserts that recovery is barred when a defendant's negligence deprived the patient of only a fifty-percent or less chance of survival. The Hawleys counter that, by its sub-issue, the Hospital concedes negligence and challenges the finding of proximate cause on the matter of probability of survival. Importantly, by its fifth issue, the Hospital asserts the trial court reversibly erred by denying its requested instruction on lost chance of survival because "some evidence existed that a less than 50% chance of survival existed

at the time of the alleged negligence." [6] The crux of the Hospital's argument regarding lost chance of survival on legal sufficiency and charge error grounds rests on the trial court's proximate cause instruction, which I would hold necessitated a further instruction. The seventh issue is the sole issue determinative of whether rendition is appropriate and is, by force, somewhat negated by the conditional concession that "some evidence existed" of lost chance of survival maintained in the Hospital's related fifth issue.[7] Based on the collateral legal sufficiency challenges, coupled with finding reversible charge error, I would hold that the erroneous jury charge prevents the Hospital from properly presenting the case to this Court.[8] *See* TEX.R.APP. P. 44.1(a). Thus, I would reverse and remand. *See* TEX.R.APP. P.

---

damage award. Even so, I would hold that this issue is not dispositive of whether to remand or render.

**6.** Texas does not recognize a common law cause of action for lost chance of survival in a medical malpractice case. *Park Place Hosp. v. Estate of Milo,* 909 S.W.2d 508, 511 (Tex. 1995) (citing *Kramer v. Lewisville Mem. Hosp.,* 858 S.W.2d 397, 407 (Tex.1993)). There is no liability for negligent medical treatment "that decreases a patient's chance of avoiding death or other medical conditions in cases where the adverse result probably would have occurred anyway." *Id.* (citing *Kramer,* 858 S.W.2d at 398).

**7.** An appellate court addresses legal-sufficiency challenges as either "no-evidence" or "matter-of-law" issues. *Gooch v. Am. Sling Co.,* 902 S.W.2d 181, 183–84 (Tex.App.-Fort Worth 1995, no writ). We analyze the issue as a "no-evidence" challenge when the party complaining on appeal did not bear the burden of proof at trial. *Id.* When reviewing facts, the "final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. Whether a reviewing court begins by considering all the evidence or only the evidence supporting the

verdict, legal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). We will review the evidence "in the light most favorable to the verdict, disregarding all contrary evidence that a reasonable jury could have disbelieved." *Ysleta Indep. Sch. Dist. v. Monarrez,* 177 S.W.3d 915, 916 (Tex.2005) (per curiam). If the evidence presented at trial would permit reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *Keller,* 168 S.W.3d at 822. "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *Id.*

**8.** The ultimate standard of proof on the causation issue "is whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred." *Park Place Hosp.,* 909 S.W.2d at 511 (citing *Kramer,* 858 S.W.2d at 400). Thus, recovery is barred when the defendants' negligence deprived the patient of only a fifty percent or less chance of survival. *Id.*

43.2(d), 43.3(b). Because the Hospital's remaining issues are not dispositive, I need not address them. Tᴇx.R.Aᴘᴘ. P. 47.1.

### III. Conclusion

I would sustain the Hospital's fourth issue. Because the jury charge used in this case contained an error that probably caused the rendition of an improper judgment, I would reverse the judgment and remand the cause to the lower court for a new trial.

