In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-08-00184-CV


____________________



AMERICAN FLUORITE, INC., and


TRIAD DRILLING & SUPPLY CO., INC., Appellants



V.



JB OILFIELD, L.L.C., Appellee






On Appeal from the 359th District Court


Montgomery County, Texas


Trial Cause No. 06-10-10429-CV






MEMORANDUM OPINION


 Appellants, American Fluorite, Inc. and Triad Drilling & Supply Co. Inc., appeal a
jury verdict rendered in favor of JB Oilfield, L.L.C. on breach of contract claims. Among
other claims, appellants argue on appeal that there is no evidence to support the jury's verdict
and that the trial court abused its discretion in failing to provide a proposed jury instruction. 
We affirm the judgment. 

BACKGROUND


 American Fluorite, Inc. and Triad Drilling & Supply Co., Inc., appellants, are affiliates
of GeoSouthern Energy Corporation, an oil and gas operating company. American Fluorite
is a holding company that owns oil and gas leases and equipment for GeoSouthern. Triad
is a management company that employs personnel for GeoSouthern. Between 2002 and
2005, GeoSouthern was storing three drilling rigs (rigs 23, 27, and 28) at an equipment
storage site known as the Tamina Road yard. Rig 27 was owned by GeoSouthern; rig 23 was
owned by American Fluorite, and rig 28 was owned by Triad. The record establishes that
GeoSouthern and its affiliates acted essentially as one company with respect to the
transactions involving the three rigs. Therefore, we refer to appellants herein collectively as
"GeoSouthern" or the "GeoSouthern affiliates." 

 On March 7, 2005, Jeff Bryant, owner and manager of JB Oilfield, L.L.C., ("JB
Oilfield" or "Bryant") brought two prospective buyers, Warren Ayres and Tommy Swanson,
to the Tamina Road yard to inspect the three rigs. On April 1, 2005, GeoSouthern entered
into a contract to sell rig 27 to Ayres's and Swanson's company, SEDCO Drilling Co., Ltd. (1) 
The written contract for the sale of rig 27 stated that the seller had retained JB Oilfield as
broker in the sale. It is undisputed that Bryant acted as a broker in the sale of rig 27 and was
paid a five percent commission on the sale. 

 In September of 2005, Tommy Swanson left SEDCO. Shortly after leaving SEDCO,
Swanson and a business partner made an offer to purchase rig 23. GeoSouthern sold rig 23
to Swanson and his partner in October of 2005 for $1,800,000. The written contract for the
sale of rig 23 stated that the seller had retained JB Oilfield as a broker in the sale. However,
the written contract for the sale was never signed by GeoSouthern. 

 On November 28, 2005, Ayres, acting on behalf of Aqua Drilling Co. L.P., a
subsidiary of Eagle Oil and Gas Company, signed an agreement to purchase rig 28 from
GeoSouthern for $2,500,000. The written contract for the sale of rig 28 does not specifically
state that the seller had retained JB Oilfield to act as a broker in the sale. The contract states
only that the "Seller shall indemnify and hold Purchaser harmless from all obligations to any
broker retained by Seller in the sale of the Assets." In the underlying litigation, GeoSouthern
disputed Bryant's involvement as a broker in the sale of rigs 23 and 28 and his right to
receive commissions on these sales.

 In 2006, Paul Culliver, the operations manager at the Tamina Road yard with whom
Bryant dealt, resigned from GeoSouthern. Thereafter, Bryant contacted two GeoSouthern
officers in an effort to secure payment of his commissions on the sales of rig 23 and rig 28
from GeoSouthern. Bryant sent an invoice to GeoSouthern claiming commissions on the
sales of the two rigs. The following day, JB Oilfield's counsel sent a demand letter to
GeoSouthern for the commissions, but GeoSouthern failed to respond. Bryant ultimately
filed suit in the district court claiming that GeoSouthern breached its agreement with JB
Oilfield to pay it a commission on the sales of rig 23 and rig 28.

TRIAL TESTIMONY AND JURY VERDICT

 At trial, GeoSouthern argued that it did not have an agreement with Jeff Bryant or JB
Oilfield to act as a broker on the sales of rig 23 or rig 28 and that in fact, Bryant had not
rendered services with respect to those transactions. JB Oilfield argued that it had an
agreement with GeoSouthern to broker the sales of rigs 23, 27, and 28 for a five percent
commission and that GeoSouthern had breached two of the agreements by refusing to pay
the commission on the sales of rigs 23 and 28. Testimony was presented from several
witnesses, including Jeff Bryant, Warren Ayres, Tommy Swanson, Paul Culliver, and other
GeoSouthern officers and employees.

 Warren Ayres, acting through Aqua Drilling, the purchaser of rig 28, testified at trial
by video-taped deposition. Ayres testified that Bryant introduced him and Swanson to
GeoSouthern and Paul Culliver and that Bryant was an "integral part of the whole process." 
According to Ayres, he, Bryant, and Swanson had numerous conversations about the
equipment (the rigs) and the condition of the equipment. In addition, Ayres testified that
Bryant took them down to the Tamina Road yard to inspect the rigs. Bryant was "always the
contact" that "took us out there, met with us, walked us through the equipment, showed us
what was for sale[,]" and was the "liaison person between all of these transactions."

 Ayres testified specifically as to Bryant's involvement as a broker in the sale of rig
28. Although not specified in the agreement that Ayres signed, Ayres testified that in his
opinion rig 28 would not have been purchased without the involvement of Bryant. When
asked if Bryant or any representative of JB Oilfield was present during Ayres's negotiations
with Culliver for the purchase of rig 28, Ayres stated that "Jeff was present through the
whole process up until right at the end when we finalized the contracts." Ayres disputed
Culliver's deposition testimony in which Culliver stated that negotiations regarding rig 28
took place only between Ayres and Culliver. Ayres stated: "That doesn't fit my recollection
of what transpired during April of 2005 and November, 2005. . . . Jeff Bryant was involved
numerous times with conversations with Mr. Culliver concerning our acquisition of the rigs." 
According to Ayres, he knew that Bryant carried conversations between the two back to
Culliver "to try to get the process moving forward for our acquisition of rig 28." Ayres stated
unequivocally that "Jeff was an integral part of this whole process from start to really finish,
in my opinion." Ayres admitted, however, that he had very little knowledge regarding the
negotiations that took place over the purchase of rig 23. 

 Deposition testimony of Swanson, the purchaser of rig 23, was also introduced at trial. 
Swanson had personal knowledge regarding the sale of all three rigs. Swanson testified that
Bryant made him aware of the drilling rigs that were for sale by GeoSouthern. Swanson
further testified that when he and Ayres initially went out to the Tamina Road yard with
Bryant, they were interested in buying all three rigs. Swanson explained that he and Ayres
bought rig 27 first because it was the most "finished" rig and they could only work on one
rig at a time. Swanson testified that Jeff Bryant was also involved in the sales of rigs 23 and
28. Swanson explained that Bryant was trying to mediate the deal because "Paul Culliver is
not the everyday guy you deal with." Swanson stated that he had discussions with Bryant
about his interest in buying both rig 23 and rig 28. According to Swanson, Bryant had acted
as a broker in the sale of rig 27 and continued to act as a broker in the sales of rig 23 and 28. 
 Swanson also testified regarding the specifics of the sale of rig 23. Swanson stated
that he had conversations with both Culliver and John Perrella, of GeoSouthern, regarding
JB Oilfield's involvement as a broker in the sale of rig 23. Swanson testified that Bryant
helped put the deal together for the purchase of rig 23. Swanson acknowledged that the
purchase of rig 23 would not have taken place had it not been for the involvement of Jeff
Bryant and JB Oilfield. When counsel asked Swanson, "[i]f Mr. Culliver testifies he never
had any conversation with Jeff Bryant regarding Rig 23, do you have any reason to believe
that's not true?" Swanson responded, "I believe it's not true." In their deposition
testimonies, Ayres and Swanson were both adamant that Jeff Bryant and JB Oilfield acted
as a broker for GeoSouthern in the sales of rig 23 and rig 28.

 Jeff Bryant testified at trial regarding his agreements with GeoSouthern to act as a
broker in the sales of rigs 23, 27, and 28. Bryant stated that sometime prior to 2005, he went
to Culliver and the two worked out an agreement that Bryant would act as a broker for the
sales of the three rigs, which Culliver was initially considering selling for scrap. Bryant
testified that he and Culliver agreed that Bryant would receive a five percent commission on
the gross sale prices of the rigs. Bryant explained to the jury in detail how he acted as a
broker in the sales of rigs 23, 27, and 28. Bryant stated that he did not send an invoice for
the brokerage fee immediately following the sale of rig 23 and the sale of rig 28 because
Culliver asked him not to send an invoice to GeoSouthern. According to Bryant, after
months of assuring Bryant that they would work out his commission on the sales of the two
rigs, Culliver resigned from GeoSouthern without paying Bryant the commissions. (2)

 GeoSouthern presented evidence that it had no formal brokerage agreement with
Bryant or JB Oilfield to sell rigs 23 and 28, and that Bryant did not act as a broker in the
company's sales of the two rigs. John Caveness, yard manager at the Tamina Road yard,
testified for GeoSouthern at trial. Caveness testified that he had known Bryant for eight or
nine years and that during that time Bryant had sold equipment at the Tamina Road yard and
had stored personal equipment at the Tamina Road yard. Caveness testified that Bryant was
involved in the sale of rig 27, but was not involved in the sales of rigs 23 or 28 like he was
in the sale of rig 27. Caveness testified that he prepared all the bills of lading for the sales
of rig 23 and 28. He testified that he and Culliver were the ones who were responsible for
putting rigs 23 and 28 in a condition to be sold. Caveness also testified that he was not aware
of any formal brokerage relationship between Bryant and GeoSouthern. 

 Deposition testimony of Culliver was also presented to the jury at trial. Culliver
admitted that he and Bryant discussed selling rigs 23, 27, and 28, and that sometime around
2002 Bryant began trying to help GeoSouthern sell the three rigs. Culliver also testified that
Bryant was not the only broker selling equipment out of the Tamina Road yard. Culliver
explained:

 [W]e didn't have more than one broker involved in any one sale. If Jeff had
a sale for something, he'd come out and said I have a sale for this. Okay. If
another broker--and there really wasn't that many--would come out and say I
have a sale for this, then I'd sell it to [the respective broker's buyer]. That's
the way it worked. 

When asked if GeoSouthern had an agreement with JB Oilfield to act as a broker to sell rig
23, Culliver responded that the sale of rig 23 was between himself and Swanson. Culliver
testified that Bryant "put a lot of energy and time" into the sale of rig 27, but that Culliver
did not "remember [Bryant] being there that much" with respect to the sales of rig 23 and rig
28. When asked, "[w]as it an oral agreement that [GeoSouthern] had with JB Oilfield to
market or sale these rigs[,]" Culliver responded, "I don't recall. He was not the only broker." 
Nevertheless, Culliver did not dispute the fact that if Bryant had not brought Ayres and
Swanson to the yard to see rigs 23, 27, and 28, the rigs would not have been sold. When
asked whether Jeff Bryant, JB Oilfield, L.L.C., ultimately responsible for the sale of Rig No.
23, 27, and 28, Culliver responded, "[W]ell, I don't know. He introduced me to those men,
and those men ended up buying them." When asked, "that's what a broker does, isn't it?" 
Culliver responded, "That's correct." When asked, "that's how [a broker] earns a
commission?" Culliver again responded, "That's correct." 

 John Perrella, the controller and Chief Financial Officer for American Fluorite,
testified at trial. When asked if Perrella understood the nature of Bryant's business [JB
Oilfield], Perrella responded, "I wasn't interested in what his business was. Other than, if he
did services for us, we would pay him. We were contracted, we didn't have a contract, we
didn't pay him." Perrella testified that Culliver told him that Bryant was not due a
commission on the sales of rigs 23 and 28, even before they received an invoice, which
Perrella "thought was strange." After GeoSouthern received an invoice from Bryant for
commissions on the two sales, Perella talked to Culliver who maintained that there was no
obligation on the company's part to pay the claimed commissions. 

 Deposition testimony from George Bishop, owner of GeoSouthern and its affiliates,
was also presented to the jury at trial. Bishop stated that he put no restrictions on Culliver
in selling the equipment at the Tamina Road yard. He stated that he knew that Culliver used
brokers from time to time to help find interested buyers. According to Bishop, he became
aware that Culliver used a broker for the sale of rig 27, but did not know at the time that
Culliver was showing other rigs. Bishop stated in his deposition that there was not a signed
copy of the contract for the sale of rig 23 because Culliver told Bishop not to sign the
contract. Bishop explained that Culliver told him not to sign the contract because "[t]here
was no broker fee involved in the sale" and paragraph thirteen referencing JB Oilfield as the
broker needed to be changed. With respect to the sale of rig 28, Bishop stated that Culliver
also told him that the company owed no broker fee for the sale of this rig and that reference
to JB Oilfield as broker on that deal was deleted in paragraph thirteen of the purchase
agreement. Margaret Molleston, vice president of GeoSouthern, also testified that she spoke
to Caveness, Bishop, and Culliver when the company received the invoice from Bryant, and
was informed by all three that the company did not owe Bryant a commission fee on the two
sales. 

 After hearing testimony for several days from a number of different witnesses, the jury
returned a verdict in favor of JB Oilfield finding that agreements existed between JB Oilfield
and the GeoSouthern affiliates to broker the sales of rig 23 and rig 28, and that those
agreements had been breached. The jury was presented the following questions regarding
the disputed agreements:

QUESTION 1


 Did JB Oilfield and American Fluorite agree that JB Oilfield would receive a
commission on the sale of Rig #23?


 . . . .


QUESTION 5



 Did JB Oilfield and Triad agree that JB Oilfield would receive a commission
on the sale of Rig #28? 


 . . . .


The jury answered "yes" to both questions. The jury further agreed that JB Oilfield
performed its obligations under the agreements and that the GeoSouthern affiliates failed to
comply with the agreements. The jury awarded JB Oilfield $215,000 in damages. 

 ISSUES


 GeoSouthern appeals the jury verdict asserting four issues on appeal. In issue one,
GeoSouthern argues that there is no evidence to support the jury's answers to questions one
and five because evidence of any existing contracts is barred by the statute of frauds. In issue
two, GeoSouthern asserts that the trial court abused its discretion by denying GeoSouthern's
request to include an instruction on the statute of frauds regarding the alleged contracts. In
issue three, GeoSouthern argues that because the award of attorneys' fees was based on a
finding of breach of contract the award of fees should be reversed. Finally, in issue four,
GeoSouthern contends that there is insufficient evidence to support the jury's answer to jury
questions ten and twelve regarding quantum meruit because there is no evidence of the value
of the services performed by JB Oilfield. 

ISSUE ONE


 GeoSouthern argues in issue one that there is no evidence to support the jury's finding
that agreements existed between the GeoSouthern affiliates and JB Oilfield to broker the
sales of rig 23 and rig 28. GeoSouthern asserts that "[i]f there was a brokerage agreement
that applied to the sale of Rig 23 and Rig 28, then it was part of an ongoing agreement that
JB Oilfield would act as a broker for GeoSouthern for various equipment that GeoSouthern
decided to sell." GeoSouthern argues that recovery under this "ongoing agreement" is barred
by the statute of frauds; therefore, any evidence of the agreement was improperly considered
by the jury and would be insufficient to support the verdict. 

 No evidence points may only be sustained in one of the following circumstances: (a)
a complete absence of evidence of a vital fact; (b) the court is barred by the rules of law or
of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the
evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence
establishes conclusively the opposite of the vital fact. City of Keller v. Wilson, 168 S.W.3d
802, 810 (Tex. 2005) (citing Robert W. Calvert, "No Evidence" and "Insufficient Evidence"
Points of Error, 38 Tex. L. Rev. 361 (1960)); see also King Ranch, Inc. v. Chapman, 118
S.W.3d 742, 751 (Tex. 2003). Here, GeoSouthen asserts that the jury was barred by the
statute of frauds from giving weight to the evidence offered to prove the agreements
allegedly breached. We disagree.

 An agreement which is not to be performed within one year from the date of making
must be in writing and signed by the person to be charged with the promise; otherwise, the
agreement is unenforceable. See Tex. Bus. & Com. Code Ann. § 26.01. "Whether a
contract falls within the statute of frauds is a question of law." Choi v. McKenzie, 975
S.W.2d 740, 743 (Tex. App.--Corpus Christi 1998, pet. denied). Section 26.01(b)(6) does
not apply if the contract could possibly be performed within one year-no matter how
improbable performance within one year may be. Iacono v. Lyons, 16 S.W.3d 92, 95 (Tex.
App.--Houston [1st Dist.] 2000, no pet.). "The fact that the entire performance within one
year is not required, or expected, will not bring an agreement within the statute." Id. Section
26.01(b)(6) only bars oral contracts which could not be performed within one year. Compare
id., with Niday v. Niday, 643 S.W.2d 919, 920 (Tex. 1982) (holding that if evidence
conclusively proves contract cannot be completed within one year, it violates the statute of
frauds). While it may have been unexpected or unlikely that the brokerage agreements with
the GeoSouthern affiliates would be performed within one year, it was possible that both rigs
could have been sold within a year from the date of the making of the agreements. See
generally Tex. Bus. & Com. Code Ann. § 26.01. Therefore, the brokerage agreements are
not barred by the statute of frauds. 

 GeoSouthern's assertion that "[t]he uncontroverted testimony at trial establishes that
Bryant had an ongoing brokerage agreement with GeoSouthern" is without merit. The
testimony presented at trial, as to whether an agreement existed between GeoSouthern and
JB Oilfield to sell rigs 23 and 28, was disputed. GeoSouthern in fact defended the lawsuit
under the theory that no agreement existed between GeoSouthern and JB Oilfield to broker
the sales of rigs 23 and 28 and presented evidence in support of that position. At most, the
uncontroverted evidence established that GeoSouthern had an ongoing business relationship
with JB Oilfield. (3) However, an ongoing business relationship does not equate to an
indefinite contract. The jury properly considered evidence regarding the brokerage
agreements presented at trial. The jury was asked questions regarding the existence of two
separate agreements and the jury answered "yes" to both questions. The jury found
GeoSouthern failed to comply with each agreement. There is legally sufficient evidence in
the record to support the jury's findings. We overrule issue one. 

ISSUE TWO


 In issue two, GeoSouthern contends the trial court abused its discretion in failing to
include an instruction on the statute of frauds in the jury charge. GeoSouthern did not object
to jury questions one and five. At the charge conference, JB Oilfield objected to questions
one and five because they lacked an instruction "to the effect that an agreement does not have
to be in writing as long as the parties have reached a meeting of the minds on the material
terms of the agreement." In response to JB Oilfield's objection, counsel for GeoSouthern
asserted that the requested instruction referenced "an issue of law and not a fact
consideration [for] the jury[.]" Counsel for GeoSouthern further requested that, in the event
the court was inclined to include JB Oilfield's proposed instruction, "an expansion of the
definition of the oral contract be included related to the Statute of Frauds, Section [26.01],
of the Texas Business and Commerce Code." The court overruled JB Oilfield's objection
to questions one and five and declined to include its proposed instruction in the charge. 
GeoSouthern's conditionally requested instruction was accordingly also denied.

 GeoSouthern subsequently filed its proposed instruction with the court, presumably
in an effort to comply with Texas Rules of Civil Procedure 278. See Tex. R. Civ. P. 278
("Failure to submit a definition or instruction shall not be deemed a ground for reversal of
the judgment unless a substantially correct definition or instruction has been requested in
writing . . . ."). Specifically, GeoSouthern proposed submission of the following instruction
to questions one and five: "An agreement that cannot be performed within one year of the
making of the agreement is unenforceable unless it is in writing and 'signed by the person
to be charged with the promise.'" On appeal, GeoSouthern argues that the trial court abused
its discretion by denying GeoSouthern's request to include an instruction on the statute of
frauds and contends that a fact issue relating to the statute of frauds should have gone to the
jury. 

 "A trial court must submit 'such instructions and definitions as shall be proper to
enable the jury to render a verdict.'" Union Pac. R.R. Co. v. Williams, 85 S.W.3d 162, 166
(Tex. 2002) (quoting Tex. R. Civ. P. 277). An instruction is proper if it (1) assists the jury,
(2) accurately states the law, and (3) finds support in the pleadings and the evidence. Tex.
Workers' Comp. Ins. Fund v. Mandlbauer, 34 S.W.3d 909, 912 (Tex. 2000). "When a trial
court refuses to submit a requested instruction, the question on appeal is whether the request
was reasonably necessary to enable the jury to render a proper verdict." Id. "The trial court
has 'considerable discretion to determine necessary and proper jury instructions.'" Id. at 911
(quoting Louisiana-Pacific Corp. v. Knighten, 976 S.W.2d 674, 676 (Tex. 1998)). A
judgment will not be reversed because an instruction was refused unless the trial court clearly
abused its discretion in refusing to include the instruction. Columbia Rio Grande Reg'l
Healthcare, L.P. v. Hawley, 188 S.W.3d 838, 861 (Tex. App.--Corpus Christi 2006, pet.
granted); Butler v. De La Cruz, 812 S.W.2d 422, 426 (Tex. App.--San Antonio 1991, writ
denied). Moreover, a trial court's error in refusing an instruction is reversible only if it
"'probably caused the rendition of an improper judgment.'" Union Pac. R.R. Co., 85 S.W.3d
at 166. 

 It is significant that submission of GeoSouthern's proposed instruction to questions
one and five would not have resulted in a finding on its affirmative defense under the statute
of frauds. In jury questions one and five, the jury was asked: (1) whether there was an
agreement between American Fluorite and JB Oilfield to broker the sale of rig 23, and (2)
whether there was an agreement between Triad and JB Oilfield to broker the sale of rig 28. 
The jury answered "yes" to both questions. What the proposed instruction attempts to do is
ask the jury to apply the law, specifically section 26.01 of the Texas Civil Practice and
Remedies Code, to the facts presented to them and determine that any oral agreement
between the parties was barred pursuant to the statute of frauds and, therefore, no agreements
existed. This line of reasoning assumes the jury would have answered "no" to questions one
and five in the event they decided that the agreements were unenforceable. However,
whether an agreement exists and whether an agreement is unenforceable under the statute of
frauds are two separate questions. At trial, the burden was on JB Oilfield to prove the
existence of the two agreements, whereas the burden was on American Fluorite and Triad
to prove the elements of any asserted affirmative defenses. Compass Bank v. MFP Fin.
Servs. Inc., 152 S.W.3d 844, 851 (Tex. App.--Dallas 2005, pet. denied); Love v. State Bar
of Tex., 982 S.W.2d 939, 943 (Tex. App.--Houston [1st Dist.] 1998, no pet.) (citing Woods
v. William M. Mercer, Inc., 769 S.W.2d 515, 517 (Tex. 1988)). 

 Moreover, the application of the statute of frauds is generally a question of law for the
court. Choi, 975 S.W.2d at 743; see also Iacono, 16 S.W.3d at 94. GeoSouthern points to
an exception to this general rule where the extrinsic evidence creates a fact issue as to
whether an agreement can be completed within one year. See Metromarketing Servs., Inc.
v. HTT Headwear, Ltd., 15 S.W.3d 190, 196 (Tex. App.--Houston [14th Dist.] 2000, no pet.).
Under such circumstances, "what constitutes a reasonable time [for performance] is a
question of fact" for the jury. Id. The evidence presented here does not create a fact issue
as to whether the brokerage agreements found to exist by the jury could be completed in one
year. GeoSouthern had the burden of proof on its statute of frauds defense. See Tex. R. Civ.
P. 94; see also Compass Bank, 152 S.W.3d at 851. If GeoSouthern thought the evidence
supported its statute of frauds defense, it should have submitted the proper jury question to
ensure a jury finding on that defense. See Tex. R. Civ. P. 273, 278; see also Love, 982
S.W.2d at 943 ("A defendant relying on an affirmative defense must plead, prove, and secure
findings to sustain the defense.") (citing Woods, 769 S.W.2d at 517). 

 While GeoSouthern pleaded an affirmative defense under the statute of frauds, it
simply did not pursue this defense at trial. We conclude on the record before us that an
instruction with respect to the statute of frauds would not have assisted the jury in rendering
a verdict, nor does it find support in the evidence presented. Under these circumstances, the
trial court did not abuse its discretion in refusing to include the proposed instruction. See
generally Mandlbauer, 34 S.W.3d at 911-12 (Court held no abuse of discretion in refusing
to include an instruction on producing cause where the case was not pled or tried under a
producing cause theory and the jury charge did not mention producing cause but submitted
the question in terms of "resulting from."). We overrule issue two. Because we have
overruled issues one and two, we need not address issues three and four. (4) We affirm the
judgment of the trial court.

 AFFIRMED.

 
 __________________________________

 CHARLES KREGER

 Justice


Submitted on November 6, 2008

Opinion Delivered March 19, 2009


Before McKeithen, C.J., Gaultney and Kreger, JJ.



1. SEDCO, which stands for Swanson Eagle Drilling Company, is a contract drilling
company that became an investor/purchaser of oilfield equipment. SEDCO was originally
owned by Eagle Oil & Gas Company, an oil and gas exploration company, that was started
by Warren Ayres. Eagle Oil & Gas acted as the parent company to several entities owned
in part by Ayres. Eagle Oil & Gas purchased Tommy Swanson's interest in SEDCO in 2005. 

2. Bryant explained that Culliver was being paid a percentage on the sales by George
Bishop, owner of GeoSouthern and its affiliates, and that Culliver stated that he would pay
Bryant or trade him equipment from the yard. Bryant stated that Culliver informed him in
August of 2006 that he had resigned from GeoSouthern but represented to Bryant that they
would still work out his commission for the sales of the two rigs. Bryant testified that he had
"heard that for months from Paul" and ultimately contacted GeoSouthern directly and sent
an invoice. Bryant explained that he spoke with Perrella who was not aware of the brokerage
agreement because "Paul had not said anything to anybody." 
3. On appeal, the GeoSouthern affiliates cite minimal evidence in support of their
"ongoing agreement" argument. Appellants rely on the following in support of this
argument: 1) From at least 2002 to 2006, Bryant acted as a broker for GeoSouthern and
inventoried the extra equipment that GeoSouthern owned; 2) Bryant advertised
GeoSouthern's equipment in trade publications; 3) Bryant brokered a number of sales on
various types of equipment owned by GeoSouthern; and 4) the commission Bryant received
on a particular sale depended upon the type of equipment being sold. 
4. GeoSouthern argues in issue three that because the award of attorneys' fees was
based on a finding of breach of contract, the award of fees must be reversed along with that
finding. Because we find the trial court's judgment on the breach of contract claim was
proper, the trial court's award of attorneys' fees to JB Oilfield was also proper. See Tex.
Civ. Prac. & Rem. Code Ann. § 38.001 (Vernon 2008). In issue four, Geosouthern
contends that because Bryant made only vague descriptions of the work he performed and
never described the reasonable value of that work, he cannot recover under quantum meruit.
However, the trial court entered judgment in JB Oilfield's favor on its breach of contract
claim not its quantum meruit claim. The court stated, "[i]n the event that Plaintiff's breach
of contract theory of liability fails on appeal, Plaintiff may elect to recover his damages under
the quantum meruit theory of recovery." Because we have affirmed the trial court's
judgment, we need not address issue four.